D. P. KINNEY AND OTHERS V. G. B. ZIMPLEMAN AND OTHERS.

1. *Quære :* Has a court of equity jurisdiction to restrain, by injunction, the collection of a tax unlawfully assessed upon personal estate ? At all events, the courts should not, except on the clearest grounds, interfere with the collection of public taxes.

2. *Held,* that the one per cent. school tax, levied by the board of school directors under Section 5 of an "Act to organize and maintain a system of " public free schools," approved April 24th, 1871, was a special tax ; and therefore was not repealed by the repealing section of the act of April 22d, 1871, giving effect to the several provisions of the Constitution concerning taxes, even though the school law, approved April 24th, 1871, went into effect by lapse of time previous to the 22d day of April, 1871, as claimed by the appellants' counsel. Repeals by implication are not to be favored.

3. Section 30 of the 3d Article of the Constitution disqualifies a person from holding two offices only when both offices have salaries, emoluments, or perquisites attached to them. Therefore, *held,* that the Governor, Attorney-General and Superintendent of Public Instruction are not inhibited, while holding their respective offices, from discharging the duties which the Legislature imposed upon them as a Board of Education.

4. The Legislature may delegate the power to district the State for educational purposes, or may employ any agencies or persons to so district the State ; and the maxim *delegata potestas non potest delegare* does not apply.

5. Section 3 of Article 9 of the Constitution provides that the Legislature may give the district boards of education such legislative powers in regard to schools, school-houses and school fund, as may be deemed necessary and proper. *Held,* that this constitutional provision authorizes the Legislature to confer upon the district boards of school directors the power to levy the school tax, and all of the powers conferred on these boards by the act of April 24th, 1871.

6. District boards of education being recognized by the Constitution, this court fails to perceive any difference between them and municipal corporations, to which it is admitted the taxing power, or power under the law to make assessments, may be delegated.

7. Note the separate opinion of Presiding Judge Evans.

APPEAL from Travis. Tried below before the Hon. J. P. Richardson.

Appellants in this case sought to enjoin the collection of the

"one per cent. school tax" levied by the Board of Education
of Travis county. The District Court dissolved the preliminary
injunction granted to the plaintiffs, and dismissed their bill,
from which judgment this appeal is prosecuted.

*A. M. Jackson* for appellants. Though presenting questions
of the most serious nature and of great importance, the facts of
this case are few and simple.

The appellants seek to enjoin the collection of the so-called
"one per cent. school tax."

Their bill for this purpose is brought against the tax-collector,
the functionaries composing the Board of Education, and also
the persons who constitute the board of school directors of the
county. The preliminary injunction granted to the plaintiffs
has been dissolved and their bill dismissed by the District Court;
and from this judgment they appeal.

Looking into the pleadings and the judgment below, it
becomes apparent that the main questions presented are :

*First.* Whether the statutory provision in the act of April,
1871 (pamphlet acts, Chapter 54), under which is claimed the
authority to levy and collect the tax, was constitutional ?

*Second.* If constitutional, was that statutory provision ever
in practical operation ; or was it repealed by the act of April
22d, 1871 (Chapter 52), which took effect within a week after
the enactment of the statutory provision above referred to, and
months before the pretended levy of the tax in question ?

Upon the answers to be given to one or both of these ques-
tions, depend the legality of the so-called tax and the consequent
disposition to be made of the present cause.

I. The immediate authority claimed in support of the tax is
the following clause in Section 5, of Chapter 54, of the acts of
1871 :

"The directors of each school district shall have authority to
"levy a tax of not exceeding one per cent., for the building of
"school-houses and maintaining schools in their respective
"school districts: and the manner of the collection and dis-

" bursement of this tax shall be prescribed by the Board of " Education for the State." (Pamphlet acts, 1st session of 1871, p. 59.)

It will hardly be denied that this provision attempts a dele-gation of the taxing power—a delegation wholly unqualified in its nature, and limited only to a maximum percentage.

Under the Constitution of the State of Texas, is it competent or possible for the Legislature to make such a delegation of the taxing power? I respectfully insist that it is not.

The general maxim that " delegated power cannot be dele-" gated " will not be denied, nor will it be denied that this principle applies to the Legislature of a State—subject, of course, to any exceptions or modifications contained in the State Constitution. I admit fully that class of so-called excep-tions to be found in charters of municipal corporations, empow-ering their functionaries to assess and collect taxes for corporate purposes. Properly understood, these are not real exceptions to the principle. For, be it observed and kept well in mind, .that in every instance wherein such a grant of the taxing power to the authorities of a county, city, or town, has ever been sus-tained, the functionaries in whom it was vested were themselves elected by the taxpayers. Such a delegation as that is in reality a mere restitution of the power to the taxpayers, through their most immediate representatives. The grantees of the power, in every such case heretofore sanctioned, were, so far as I know or believe, functionaries of the corporation, elected by the tax payers and the constituents of the corporation, and elected with a view to, and for the purpose of, administering the corporate affairs for the promotion of which they were empowered to tax their constituents. In every such instance, therefore, the grantees of the power were elective representatives of the tax-payers ; and the power was confided to them, instead of being exercised directly by the Legislature, because they were more immediate representatives of the taxpayers, and more directly imbued with their feelings and wishes, as well as more familiar with their interests, than the Legislature was or could be. On

these grounds have such grants of the taxing power to municiapl authorities been vindicated in legislative bodies and by judicial tribunals, as well as by the elementary writers upon law and government; and thus has been preserved inviolate that fundamental principle of law as well as of free government, that " Taxation and Representation must go together."

Consider, however, the nature of the statutory provision above quoted. Who are "the directors of each school district" upon whom it attempts to confer the power of taxation? Whence do they originate? How are they constituted? What is their relation to the people to be taxed? The answers to these pertinent and vital questions are patent upon the face of the statute from which the provision itself is extracted, and therefore are within the judicial knowledge of this court.

This is their pedigree: the Governor appoints the Superintendent of Public Instruction, "by and with the advice and " consent of the Senate;" the Superintendent appoints for each judicial district "one supervisor of education   *   *   *   for " four years, unless sooner removed," and he is removable by the Superintendent with the approval of the Governor; the supervisors can divide their counties into school districts, and " appoint five school directors for each school district," but "the " authority of the supervisors in these respects shall be subject " to the control and revision of the Superintendent," and it is made their duty to enforce "all rules and regulations adopted " by the Board of Education." The "school directors," then, are the removable appointees of the removable appointees of an appointee of the Executive of the State; and in these creatures of the creatures of an executive creature we find lodged, if this provision be law, the taxing power, one of the highest attributes of sovereignty! In which of that long line of ancestry is to be found a representative in the remotest degree of the people to be taxed? Is there so much even as a "fiction of law" upon which to base a pretense that the school directors represent any fragment of the people, or any man, woman, or child, save the executive functionaries from whom they have their being?

Surely these considerations demonstrate that no real or truthful analogy exists between municipal corporations and these school directors, with respect to their capacity to receive a delegation of the taxing power; and all arguments based upon an assumption of such an analogy must be abandoned.

There is, however, a clause in the State Constitution under which it is probable that a more plausible attempt to vindicate the delegation will be attempted, viz., "The Legislature may " lay off the State into convenient school districts, and provide " for the formation of a board of school directors in each dis- " trict. It may give the district boards such legislative powers, " in regard to the schools, school-houses, and school fund of the " district, as may be deemed necessary and proper." (Constitution, Section 3, Article 9.)

Here, then, in the first place, we have in the Constitution itself an express provision for the creation of school districts, and the formation of boards of school directors; and by this provision it is upon the Legislature, and upon it alone, without any power of delegation, is conferred the authority to create the districts and form the boards. I repeat, that neither by this clause nor any other of the Constitution, either in express terms or by any possible implication, is authority given to the Legislature to delegate to others its power "to lay off the State into " convenient school districts, and to provide for the formation of " a board of school.directors in each district." If, therefore, this court should hold that the Legislature can delegate those powers to a "supervisor of education," it must be because the court imputes to the Legislature an unlimited authority to delegate any and every legislative power it possesses, and to whomsoever it may see fit. Logical necessity compels the whole of that conclusion. There is and can be no stopping-place short of it.

In the Legislature is vested the power to define and punish crimes, even to the deprivation of life and liberty. Can it delegate that power to a constable, a coroner, or a private citizen? Most assuredly it can, if it can delegate to a supervisor of education the power to "lay off the State into school

" districts."   The one power is no more legislative than the
other.   There is no more authority to delegate the one than
the other.   It is a logical and inevitable conclusion, there-
fore, that if either can be delegated, both may be.   For it is
to be observed that the subsequent clause, in the same sec-
tion, which authorizes the Legislature to give to the district
boards certain " legislative powers," can have no bearing what-
ever on this question now on hand.   Nowhere in it or else-
where in the Constitution is such a functionary as a " super-
" visor of education " recognized for any purpose whatever.
The " school boards" are the only functionaries to whom any
delegation of " legislative powers " is permitted, and even to
them the power to " lay off school districts " could not have
been given by the Legislature, because it is not one of the three
designated subjects (viz., " schools, school-houses, and school
" fund ") in regard to which any legislative power is authorized
to be conferred upon them.

But the Legislature, by the act in question (Chapter 54, Sec-
tion 2, acts of 1871, page 58) attempts to divest itself of this
legislative power and duty to lay off the school districts, and
to confer it, and also the power to appoint the school directors,
upon a class of second-hand executive appointees; and it is
upon the school directors thus to be appointed, for the school
districts thus to be created, that the subsequent Section 5
attempts to confer the power to tax, and the tax complained
of in this case is the edict of " school directors " appointed in
the manner provided in this enactment.

I submit, therefore, that no lawful school districts could be
thus created, and none such are in existence.   This result fol-
lows inevitably, unless it be true that the Legislature can dele-
gate without limit any and every legislative power it possesses ;
and surely such a pretense will never receive the sanction of
this court.

But if the so-called school districts have no lawful existence,
how, in the nature of things, and in view of the Constitution,
can there possibly be a " board of school directors in each dis-

" trict ? " As the basis of the whole organization the Constitution empowers the Legislature to " lay off the State into con-" venient school districts," and it is " in each district " to be laid off by the Legislature that a " board of school directors " is to be formed as to be provided for by the Legislature. There must, therefore, be lawful districts, or there can be no lawful boards for any purpose, and this so-called power to tax falls with the rest of the fabric. The grantees of it have no existence, actual or potential. The whole enactment is plainly subversive of the positive provisions of the Constitution, and confers no authority on any one to exact a dollar from any citizen of the State.

II. The same conclusion results from different premises when other provisions of the Constitution and the law are confronted with each other.

Concede, for the argument, that both the districts and the boards have a lawful existence, and still we deny wholly the validity of the so-called tax.

Recurring to the Constitution, what " legislative powers " can be conferred by the Legislature upon the district boards ? Such only as have for their subject-matter the " schools, school-houses and school fund of the district." Now the subject-matter of this pretended tax is the taxable property of the people, and that comes under neither head. Doubtless it will be said that it regards the " schools and school-houses," because those are the ostensible objects upon which the money to be raised by the tax is to be expended. But if that pretense proves anything it proves too much. Will it be pretended that any legislative power can be conferred upon the boards, if any possible relation can be imagined between it and either the " schools, school-houses, or school fund of the district ? " If so, it is obvious that no limit can be assigned to the powers which may be delegated to these boards. The right of eminent domain, empowering them to take any private residence for a school-house, may be conferred upon them ; and incident to it the further right to tax *ad libitum*, to provide the means to compensate the former

owner. Or, to put a more apposite illustration, in order to maintain discipline in the schools the board may be empowered to legislate away the lives or liberties of refractory scholars. The connection between such a power and the " schools " is far more direct, immediate, and obvious than that between the taxable property of the county and the schools, school-houses, or school fund. But who would attempt to vindicate the constitutionality of such a measure?

The truth obviously is, that the " legislative powers " grantable to the boards must be strictly limited to the three enumerated subjects. No legislative powers in regard to any other subjects can be delegated to them. Nor can they be empowered to create the subject in regard to which they may be granted " legislative powers." To illustrate this by the constitutional provisions themselves: What the " school fund " is and what it shall be, is prescribed by Section 6 of the same Article 9 of the Constitution. It must therefore have been this " school fund " " in regard to" which the district boards might be endowed with " legislative powers." Nowhere is the Legislature authorized to delegate or give to the boards the power to increase or diminish the " school fund." It is, therefore, in regard to a school fund deriving its existence from the Constitution itself, and not in any degree dependent upon the district boards, that these boards may be invested with " legislative powers." This being so with reference to the school fund, it must be equally so with reference to the schools and school-houses; for they are all enumerated in the same clause and in immediate connection with each other, so that it is not competent for the Legislature to confer upon the school boards more extensive " legislative powers " with regard to one than another of the three subjects, and if the boards cannot be empowered to create the school fund of the districts, neither can they be empowered to create the schools or school-houses.

A consideration of the very next section (7) of the same Article makes this conclusion still more obvious and undeniable. In this section the Constitution expressly contemplates and pro-

vides against an insufficiency of the school fund to furnish " the " necessary school-houses in each district, and insure the educa- " tion of all the scholastic inhabitants;" and it expressly empowers the Legislature to " provide for the raising of such " amount by taxation, in the several school districts in the State, " as will be necessary " for those purposes.

Now, one of two things is true with regard to this section, viz.: it is either wholly superfluous and nugatory, or else it confers upon the Legislature a power it would not otherwise have had. If the latter be the case, as obviously it must be, then it follows that this power was not comprised within any of the provisions of the previous Section 3, which is the section that authorizes a delegation of certain legislative powers to the district boards.

Unless, then, authority can be found in Section 7 itself, or in still some other clause of the Constitution, for the Legislature to delegate to the district boards this power " to provide " for the raising of such amount by taxation, in the several " school districts of the State, as will be necessary " to furnish the school-houses, &c., it follows inevitably that this attempted delegation of the power to the district boards by the statute in question is void. But Section 7 does not authorize the Legislature to delegate this power to the district boards or to any other authority; neither is there any other clause in the Constitution which does. Can the power to delegate it be supplied by any implication, inference, or intendment? Purposely avoiding the abstract and theoretical, though none the less weighty arguments suggested by the genius of our institutions and the representative structure of our government, and confining myself purely to the text of the Constitution and the language of the courts, I deny that the power of delegation can thus be supplied.

By Section 3 of Article 3 of the Constitution, the " legislative power of the State " is vested in a Senate and a House of Representatives, constituting " the Legislature of the State of Texas." That clause comprises, of course, all the legislative power within

the provisions or purview of the Constitution. Careful and peremptory provisions are made by the Constitution itself for the election by the people of the persons who are to exercise any portion of that power. Positive and stringent restraints are imposed in many important respects upon both the extent and the manner in which that power shall be exercised, even by the elective representatives of the people. These and many other considerations of the same kind would suffice to repel the supposition that, without express authority, the Legislature could delegate that power to persons arbitrarily designated by itself or any other branch of the government, and devoid of the representative character which in republican governments is an indispensable qualification of every legislator. The general principle respecting delegated powers repels it; that Legislatures are within the scope of that principle has been repeatedly decided by the Supreme Court of the United States, as well as by the appellate courts of the States. (10 Wheaton, 1; 2 Black, 510.)

There is, I believe, but the one place in our Constitution where any delegation of legislative powers is authorized (Section 3, Article 9, already cited), and that is expressly confined to three enumerated subjects, in neither of which is the right to tax involved. So, on the other hand, in Section 7 of the same Article, although the Legislature is authorized to tax for these school purposes, yet the authority to delegate that power is withheld. In short, where the Constitution has authorized a delegation of legislative powers, it has specially designated the subjects of such powers, and taxation is not one of them; and where it has expressly conferred upon the Legislature the power to tax, it has not given it the right to delegate that power.

Passing on to another aspect of the question, I affirm that, even if the Legislature had a general right to delegate any and all of its powers, yet the persons upon whom it has attempted to cast this power are expressly incapacitated by the Constitution from receiving or exercising it.

Section 1, Article 2, makes the usual distribution of the

powers of government between "three distinct departments," viz.: the legislative, the executive, and the judicial; and then, as if forestalling and prohibiting just such legislation as is now under discussion, it declares "that no person, or collection of "persons, being of one of these departments, shall exercise any "power properly attached to either of the others, except in the "instances herein expressly permitted."

In this connection, then, I ask again, who are these school directors? To which branch, if to any, do they appertain? Are they legislators? Certainly not, in any constitutional sense. Are they of the judiciary? That will not be pretended. Then they must be of the executive, if anything at all. From the chief Executive, directly, though not immediately, they derive their existence. By him, in effect, they are removable. To him and his appointees alone are they accountable. The ordinary duties of school directors are executive in their nature. In every sense, then, they are of the executive department of the government.

How, therefore, under the express and peremptory prohibition, can they exercise the taxing power, the most unequivocal and one of the highest attributes of the legislative department? It is plainly and palpably impossible, unless they were "expressly permitted" to do so by the Constitution itself, and nowhere, as already shown, has this been done.

How, for the same reasons, can the "supervisor of education" lay off the districts, when the duty and the power to do that are put upon the Legislature alone?

Nor is this the only constitutional prohibition of the kind. Section 14, Article 4, reads thus; "No person, holding the "office of Governor, shall hold any other office or commission, "civil or military." Yet this same act of the Legislature assumes to commission the Governor, the Attorney-General, and the Superintendent of Public Instruction, to constitute a "Board of "Education," with plenary powers; and an integral portion of the attempted delegation of the taxing power provides that this Board of Education shall prescribe "the manner of the collection

" and disbursement of the tax."   Where, in all the Constitution, is there an " express " or any other permission to the Governor, or any of his appointees, to exercise such powers; or where is a " Board of Education " recognized for any purpose ?   Assuredly, then, if this legislative enactment be law the Constitution is not. It is futile to attempt to reconcile them by construction.   The antagonism is too direct and deadly; one or the other must die.

And yet again: the Constitution is emphatic that " taxation " shall be equal and uniform throughout the State;" and that " all property in the State shall be taxed in proportion to its " value, to be ascertained as directed by law."   (Section 19, Article 11.)

Now, this enactment of 1871 so provides that the rate of the tax may vary with every district in the State.   In one district the entire one per cent. may be levied, and in the next the hundredth part of it.   And so far from providing the least precaution against this flagrantly unconstitutional result, the language of the act directly permits it.   Is it not to all intents a State tax ?   Clearly it is to be levied, or may be levied, throughout the State ; and the Constitution expressly provides that the school system, in aid of which it is to be levied, shall be a " uni- " form system throughout the State."   In all essential respects, then, it is a State tax, and the manner in which it is to be levied directly contravenes the positive mandate of the Constitution.

Again: there is no provision whatever by which is to be ascertained the value of the property on which this tax is to be levied.   No assessment is provided for.   None is adopted. According to the Constitution, the justices of the peace are the assessors.   But the bill in this case charges, and the fact is not denied, that this tax is levied, not upon any assessment made with a view to it, but upon an assessment made for other taxable purposes; and that this is done, not by any authority of the Legislature, but by orders of the Board of Education. Even this unprecedented enactment does not purport to give such authority to the Board of Education.   So that, even

if that board could receive and exercise such a power, its assumption of it is as naked a usurpation as can possibly be conceived of. If the enactment was valid in every respect, it gave to the Board of Education no other authority in regard to the tax, than to prescribe the manner of the collection and disbursement. The assessment of it is not confided to them, or to anybody. There could be no levy without a lawful assessment, and there has been no assessment. If the Constitution is worth the paper it is printed on, the levy is unwarranted by law.

It would be easy to amplify the leading considerations which I have merely indicated, and which, indeed, cannot be adequately presented within the limits of an ordinary argument. In Cooley's Constitutional Limitations they are discussed at length, and the numerous cases which amply sustain them are collated or cited; and I know of no elementary authority, nor of any modern adjudication, which calls them in question.

In addition, however, to the cases cited in the work referred to above, I beg leave to commend for examination an able decision of the Supreme Court of Illinois, in the case of People v. The Mayor of Chicago, 2 American Reports, 278. In this case it is held that commissioners not elected by the electors of a municipality, could not be empowered by the Legislature, without the consent of the electors, to issue bonds of the city for city improvements. The reasoning of the court shows both the incompetency of the Legislature to delegate, and the incapacity of the commissioners to receive, the power—because, in substance, it involved an ultimate necessity to tax for the payment of the bonds.

This is full and clear in support of the leading positions I have taken, and is far more weighty when applied to an entire State and her people, than when limited to a single city or town.

III. The bill in this case further charges, that if the statutory provision, already cited from the act of April, 1871, was constitutional when enacted, yet it was repealed immediately after its passage by the act of April 22d, 1871, published as Chapter 52, beginning on page 43 of the acts of that year.

As these two statutes stand in the pamphlet acts, the latter appears to be the earlier act of the two, for the former purports to have been approved on the 24th of the same month, two days subsequent to the approval of the other. If this was the real state of the matter, of course there could be no pretense of a repeal of the later act by the earlier one, and our position would be preposterous.

But the bill alleges in effect that Chapter 54, though published as approved on the 24th of April, had in truth and in fact become a law five or six days previous to that date, in consequence of the failure of the Governor to sign or return it within five days after it was presented to him. That is an allegation which admits of proof, and if established by proof it establishes the fact that the act of April 22d is the later and not the earlier enactment of the two, and repeals the other one in all respects wherein repugnancy exists between them.

But the dismissal of the bill, on the motion and exceptions of the defendants, deprived the plaintiffs of all opportunity to make that proof. That action of the court below, therefore, was manifestly erroneous, if, assuming Chapter 52 to be the later enactment, it repeals the provision in Section 5 of Chapter 54, which purports to authorize the levy of the tax.

If, upon the other hand, there is nothing in Chapter 52 which either expressly or by repugnancy could repeal that provision, then, of course, the plaintiffs have not in this respect been injured by the action of the court; for in that case it is immaterial which act first became law.

Assuming, then, that Chapter 52 is the later enactment, I insist, first, that it expressly repeals the provision in question; and second, that if not expressly, it still repeals it by clear, positive, and irreconcilable repugnancy.

Chapter 52 is entitled "An Act to give effect to the several "provisions of the Constitution concerning taxes." It proceeds to declare a levy, and to provide for the assessment and collection of every tax authorized by the Constitution; and among the rest, of the tax for "school-houses in each district,

" and to insure the education of all the scholastic inhabitants of
" the several districts." (See Section 8, p. 47, pamphlet acts of
1871.) By Section 32 it declares that " all laws and parts of
" laws in conflict herewith, except such as authorize special
" county taxes and other special taxes, be and are hereby re-
" pealed."

If the tax complained of be a general and not a special tax,
there can, of course, be no question of its repeal. In that case
the repeal is express. To which class of taxes, then, does it
belong?

Wherever the Constitution authorizes a " special" tax, it so
denominates it—see, for instance, Section 46 of Article 12.
But no tax or " taxation" authorized for any purpose connected
with the public schools is denominated by it a special tax. The
school system itself, as provided for by the Constitution, is as
general a system as can possibly be constructed by State legis-
lation. It is co-extensive with the whole State. Every provis
ion made for it, as well in respect of taxation as other matters,
is impartially operative over the whole State. And this same
statutory provision now in question, purporting to empower the
school directors to levy the tax complained of, is itself of the
same general character, and nowhere calls the tax a special tax.
It is true, that by an effort of the mind we can dissociate each
school district from the rest, and contemplate the tax levied
upon it alone, and in that strained and unnatural sense denom-
inate the tax a special one on that district. But if that process
be legitimate, it is easy to show that no such thing as a gen-
eral tax can exist; for in like manner, we can dissociate each
tax-payer from the rest, and contemplate the State tax upon his
poll and his property as a tax special to him.

Again: if this is a special tax upon each district, it is clear
that what funds are raised by it in any one district must be
expended in that district. But it is believed that this is not
admitted or acted on by the school functionaries themselves,
and that they treat the whole proceeds of the tax, throughout
the entire State, as one common fund, to be expended in any

district they choose. In morals and logic, if not in law, this ought to estop them from pretending that the tax is a special one.

But if, contrary to this reasoning, the tax be held a special one, and therefore not expressly repealed by Section 32 of Chapter 54, a brief consideration of the entire purport and all of the provisions of that statute must suffice to demonstrate the repeal.

The title of the act shows its object to be to "give effect to "the several provisions of the Constitution concerning taxes." This title and this object comprise the constitutional provision for a school-house and education tax as well as any other constitutional provision concerning taxes. Coming down to its details, we find that in Section 8 it makes direct reference to Section 7, Article 9 of the Constitution, which authorizes a school-house and education tax; and we find further that, for those express purposes, it levies a tax of one-fourth the amount of the State tax, with the very significant proviso that if this tax is deemed too large, it may be reduced by the County Court. Now, I ask in all candor, by what possible construction, interpretation, implication, inference, intendment, or other mental process, can that section be so harmonized with the provision of Chapter 54, now in question, as to leave them both in force as law ?

Suppose that on the 17th or 18th of April, 1871, the Legislature could and did authorize the school directors to levy a tax of one per cent. for these purposes; had not the Legislature a right at any time thereafter to resume that authority and exercise it itself ? Surely, that will not be denied. And here we show that it did subsequently resume that authority and exercise it by a law of its own enactment. Looking to this law, we find that it absolutely exhausts all the power the Legislature had upon the subject. For it not only levies the amount which it deems "necessary" for the constitutional objects in view, but it clearly expresses the legislative intent that no more than the amount thus levied shall be levied, while less may be, if the

whole of that amount shall not be "necessary." That provision, I repeat, exhausted the legislative power over the subject. That power was limited to the amount which the Legislature itself deemed "necessary" for the objects to be effected. The act of April 22d levies a maximum amount then deemed necessary for those objects, with provision for its reduction if unnecessarily large. Did not this, of necessity and in the nature of things, revoke any authority previously conferred upon the school directors to levy a tax for the same purpose? To me it seems as clear and incontrovertible as the law of physics which precludes two solid bodies from occupying the same space at the same time.

Of course the Legislature itself, at a still subsequent time, could, if it deemed it "necessary," make such further levies as it saw fit. But none such have been made—and that is an end to the question in hand.

IV. With a few words touching the remedy in this character of case, I shall conclude. That injunction will lie in such a case as is made in this bill is directly decided by the Supreme Court of the United States in Dows v. The City of Chicago, 11 Wallace, 108; where the subject is considered, the cases examined, and the conclusion deduced that when the bill charges that the tax is illegal, and that its enforcement will either lead to a multiplicity of suits, or cause irreparable injury, or becloud the plaintiff's title to real estate, the injunction will lie.

Considering the court by which that decision is made, and its direct application to this case, I feel excused from further notice of the remedy which we invoke or the relief for which we pray.

*S. G. Newton* and *J. H. Bell*, for appellees.

WALKER, J. The appeal in this case is taken from a judgment of the District Court of Travis county, dissolving an injunction which restrained the defendant, G. B. Zimpleman, sheriff and *ex-officio* assessor and collector of taxes for said

county, from collecting what is commonly known as the one per cent. school tax.

We shall not notice, in their order, the assignments of error; but we shall consider the very important questions which are presented upon the record, and treated in the briefs as decisive of the case. It is necessary that we should give but a passing notice to the pleadings in the case; they are drawn with great professional ability and skill, and fairly present the issues of law which demand our consideration.

A question of great importance is presented in the case, which we are not called on to decide, and simply call the attention of the profession to it as a question which we believe to be open in this State. In Dodd et al. v. the City of Hartford, 25 Conn., 232, it was decided that a court of equity would not, except on the clearest grounds, interfere with the speedy collection of public taxes. And in the case of Lewis O. Wilson v. the Mayor, Aldermen, and Commonalty of the City of New York et al., 4 N. Y., E. D. Smith, 675, it was held that when no legal right exists to impose a tax, if the same be collected by distress and sale of goods, or if, upon the levying of a warrant, the tax is paid to save the property, the money may be recovered back of the body who receives it from the collector. "Ac- "cordingly, held, that as a party aggrieved has remedies at law, "a court acting as a court of equity has no jurisdiction to "restrain by injunction the collection of a tax unlawfully "assessed upon personal estate."

The same rule has been laid down by the Supreme Court of Ohio in a number of cases.

Yet it is true that the Supreme Court of the United States have held a contrary doctrine in the case of Dows v. the City of Chicago, 11 Wallace, 108. And other respectable author- ities may be found to the same point; yet a majority of the court believe that the doctrine as recognized in Connecticut, that courts of equity ought not, except upon the clearest grounds, to interfere with a speedy collection of public taxes, lays down the correct rule, and one which ought to be every-

where recognized; as great mischief to the public interests, and detriment to the public service, would doubtless grow out of a practice, if adopted by courts of equity, of interfering by injunction with the collection of the public revenue, if not governed by the strictest rules of equity practice; and it is difficult to conceive why a court of equity should interfere to redress the real or supposed wrongs of an individual to whom the courts of law are open, and who has a clear legal remedy against an officer who enforces the collection of an unconstitutional or illegal tax.

It is claimed by the appellants, that the act of the Legislature, approved April 24th, 1871, entitled "An Act to organize "and maintain a system of public free schools in the State of "Texas," actually ·became a law on or about the 17th or 18th of April, 1871, and was repealed by a subsequent act of the Legislature, approved on the 22d day of April, 1871, entitled "An Act to give effect to the several provisions of the Constitu- "tion concerning taxes."

Admitting the chronological order of the passage of these acts to be as claimed by the appellants, then, if the latter repeals the former, it must be by implication; for both these acts were bills which originated in the Senate, and by reference to the journal of that body it will be seen that the act passed on the 22d of April, with the Sections 8 and 30 (claimed to be the repealing sections) in it as passed, was introduced on the 2d day of February, 1871, as bill No. 94.   (See Senate Journal, page 136.)

The school law was introduced on the 16th February, subsequent to the introduction of bill 94, and was numbered 166. (See Senate Journal, pp. 262 and 492 *et seq.*)

It cannot, then, be rationally supposed that it was intended by any part of bill 94 to repeal any provision of bill 166, the provisions of which had not yet been heard of in the Senate, and were probably yet sleeping in the brain of their author.

But, however satisfactory these facts may answer as to any intention of the Legislature tó repeal the school law, in any of its provisions, by any of the provisions of the tax law, it is

nevertheless urged that the former is necessarily repealed by the implications of the latter and the irreconcilable repugnance of the two.

In the case of Cass *v.* Dillon, 2 Ohio State, 607, the Supreme Court of Ohio says, that repeals by implication are not to be favored, and lays down the rule, viz., that the repugnance which must cause the law to fall, must be necessary and obvious. And touching the question of the unconstitutionality of an act, that court in the same case says: "If by any fair course of " reasoning the law and Constitution can be reconciled, the law " must stand."

But the 32d Section of the act of April 22d, 1871, which · reads as follows: " All laws and parts of laws in conflict here- " with, except such as authorize special county and other special " taxes, shall be and are hereby repealed, saving and reserving all "rights of the State, of the respective counties, and of the " officer thereof under the same, the rights of the officers " to be adjusted in conformity with the instructions to be issued " under this act," is certainly decisive of the intention of the Legislature to except the special taxes from the operation of the repealing clause; and we hold that the one per cent. school tax, which by the 5th Section of the school law, the directors of the school districts are authorized to levy in their respective districts, is to all intents and purposes a special tax. It is not levied as other taxes are levied, nor, when collected, does it go to the general revenue fund; but it is left to the directors, in their discretion, to levy any amount less than one per cent. on the taxable property of their districts, and the money so levied and collected should be disbursed for the sole and exclusive benefit of the several districts within which and for which it is so levied and collected.

This was obviously the intention of the Legislature, and it would be manifestly unjust to tax the property or people of one geographical subdivision of the State for the good of another, and it may be very proper here to remark, that by reference to " Exhibit C" of the record this appears to be the understanding

of the Superintendent and Board of Education. The extract reads as follows: "Rule 9th. The tax levied by the school " directors of each school district of the different counties shall " be collected by the sheriff of each county, and by him depos- "ited with the treasurer of the board of directors, subject to " the order of the school directors, in whose school district the " money may be collected, on approval of said order by the Su- " perintendent; and said money shall not be paid out by any " treasurer, except in accordance with the rules and regulations " of the State Board of Education."

We are, therefore, of the opinion that the act approved April 24th, 1871, is not repealed by the act approved April 22d, 1871, though the first named act may be prior in the true date of its passage.

An act of the Legislature, approved on the 29th of November, 1871, supplemental to the general school law, provides the manner of dividing the State into school districts, and reads as follows:

"An Act supplementary to and amendatory of an act entitled,
" ' An Act to organize and maintain a system of public free
" ' schools in the State of Texas,' approved April 24th,
" 1871.

" SECTION I.—Be it enacted by the Legislature of the State " of Texas, that the second section of the above recited act be " so amended as hereafter to read as follows, viz.:

" *Clause first.* The Board of Education shall, upon the pas- " sage of this act, proceed to apportion anew the territory of " this State into convenient educational districts, not to exceed " twelve in number; provided that nothing in this clause shall " be construed as to prohibit said board hereafter from consoli- " dating or otherwise changing or altering the boundaries of " said districts for educational purposes.

" *Clause second.* And as soon as the educational districts " contemplated in the foregoing clause shall be created, it shall " be the duty of the Superintendent of Public Instruction to " retire or relieve from duty each supervisor of education hereto-

" fore appointed and commissioned as such ; and the said Super-
" intendent is hereby authorized to appoint, with the approval
" of the Governor, for each newly created district, one super-
" visor of education, who shall hold his office for the term of
" four years from the date of his commission, unless sooner
" removed by said Superintendent for cause, on the approval
" of the Governor; and the supervisor may act as examiner of
" teachers.

" *Clause third.* And each supervisor so appointed shall re-
" ceive for his services, out of any moneys belonging to the
" available school fund not otherwise appropriated, first, a salary
" of eighteen hundred dollars per annum ; second, all expenses
" for postage; and third, all travel ing expenses necessarily in-
" curred while employed in the actual discharge of the duties of
" his office ; provided, that the amount of the above mentioned
" expenses shall not exceed the sum of two hundred dollars, on
" voucher to be approved by the Superintendent of Public In-
" struction, during any one scholastic year.

" *Clause fourth.* And the supervisors herein provided for
" shall be empowered to lay off and subdivide the counties in
" the territory under their jurisdiction into convenient school
" districts ; and they shall also appoint, on the approval of the
" Superintendent of Public Instruction, five directors for each
" school district ; but the authority of the said supervisors in
" the management, control, and oversight of their respective
" districts, shall be subject to the control, direction, and re-
" vision of the said Superintendent; and it shall be the further
" duty of the said supervisors to enforce, in their respective
" districts, all rules and regulations adopted by the Board of
" Education for the government of the public free schools in
" this State.

" SECTION II.—Be it further enacted, that the unexpended
" balance of the deficiency appropriation for the scholastic year
" ending on the 31st day of August, 1871, be, and the
" same is hereby added to and made a part of the appropriation
" for the scholastic year ending 31st day of August, 1871,

" and to be apportioned as required by Section 1 of the " above cited act.

" SECTION III.—That the Superintendent of Public Instruc- " tion, with the approval of the Governor, shall make requisi- " tion from time to time for such sums of money as may be " necessary to pay the teachers and employes of the Bureau of " Education, out of any funds in the Treasury appropriated " for that purpose, which shall be sufficient authority for the " Comptroller to issue a warrant therefor, and the Superin- " tendent of Public Instruction shall, on disbursing each req- " uisition, file his vouchers with the Comptroller of Public " Accounts.

" SECTION IV.—That this act take effect and be in force " from and after its passage.

" Approved November 29th, 1871."

It is urged against the law, that the Constitution is violated in the mode of districting the State for school purposes, inasmuch as the authority is delegated to the Board of Educa- tion, and that they performed the duties assigned them in viola- tion of the 30th Section of the 3d Article of the Constitution.

This clause of the Constitution has excited much attention ; we think it is not difficult to understand.

An office, says Bouvier, is a right to exercise a public function or employment, and take the fees belonging to it. (See also 3 Serg. & R., 149.)

An appointment or employment, the exercise of a trust or duty, may be assigned without fees, emoluments, or perqui- sites, by the Legislature to any constitutional officer as a part of his official duty, without making him the incumbent of two offices. The Legislature may direct that the Governor, the Attorney-General, Superintendent of Schools, or any other officer of the State government, shall discharge other duties to the public than those ordinarily belonging to the functions of his office ; and they may so discharge such duties without fees or emoluments, and not violate the 30th Section of the 3d Article of the Constitution.

We believe it will be found that where any individual is prohibited from holding more than one agency, appointment of trust or profit, or exercising the duties of what might be considered two offices, they must be such as have salaries, emoluments, or perquisites attached to them. We do not, therefore, consider that the Governor, Attorney-General, and Superintendent are inhibited, whilst holding their respective offices, from discharging the duties which the Legislature have imposed upon them as a Board of Education.

That the Legislature may delegate the power, or that they may employ other agencies or persons, to district the State for educational purposes, we entertain no doubt. The maxim *delegata potestas non potest delegare*, does not apply here.

The Legislature enacts laws to be administered by the judicial, executive, and ministerial officers; and in so far they delegate their power to these officers—a power directly derived through them from the people, and more conveniently exercised than it could be by the Legislature itself, immediately. Indeed, it would be impracticable in many instances, without these mediate agencies, for the Legislature to carry out the objects and purposes of the law. In some cases it would be impossible, and we here employ the maxim *Lex non cogit ad impossibilia*. These principles are familiar to the theory and practical working of every constitutional form of government.

But we come now to consider by far the more difficult problem presented for our solution in this case.

It is evident that the framers of our Constitution regarded it as one of the highest and most sacred duties incumbent upon their body, to make plenary provision for a system of common schools, to be inaugurated throughout the State by the Legislature, under wise and wholesome forms of law; and so ample is the provision, and so honorable to the body of men who devised it, that we here insert the whole article of the Constitution bearing upon this case, as part of this opinion, together with an appropriate extract from the act of Congress approved

37

March 30th, 1870, admitting the State of Texas to representation in the national Congress.

The extracts are as follows:

"An Act to admit the State of Texas to Representation in the "Congress of the United States.

"That the Constitution of Texas shall never be so amended "or changed as to deprive any citizen or class of citizens of the "United States of the school rights and privileges secured by "the Constitution of said State.

"Approved March 30, 1870."

Extract from Constitution of the State of Texas.

"ARTICLE IX.—PUBLIC SCHOOLS.

"SECTION I.—It shall be the duty of the Legislature of this "State to make suitable provisions for the support and main- "tenance of a system of public free schools, for the gratuitous "instruction of all the inhabitants of this State, between the "ages of six and eighteen years.

"SECTION II.—There shall be a Superintendant of Public "Instruction who, after the first term of office, shall be elected "by the people; the first term of office shall be filled by ap- "pointment of the Governor, by and with the advice and con- "sent of the Senate. The Superintendent shall hold his office "for the term of four years. He shall receive an annual salary "of two thousand five hundred dollars, until otherwise provided "by law. In case of vacancy in the office of the Superintend- "ent, it shall be filled by appointment of the Governor, until "the next general election.

"SECTION III.—The Superintendent shall have the supervis- "ion of the public free schools of the State, and shall perform "such other duties concerning public instruction as the Legisla- "ture may direct. The Legislature may lay off the State into "convenient school districts, and provide for the formation of "a board of school directors in each district. It may give the "district boards such legislative powers, in regard to the schools, "school-houses, and school fund of the district, as may be

"deemed necessary and proper. It shall be the duty of the
"Superintendent of Public Instruction to recommend to the
"Legislature such provisions of law as may be found necessary,
"in the progress of time, to the establishment and perfection
"of a complete system of education, adapted to the circum-
"stances and wants of the people of this State. He shall,
"at each session of the Legislature, furnish that body with
"a complete report of all the free schools in the State,
"giving an account of the condition of the same, and the
"progress of education within the State. Whenever required
"by either House of the Legislature, it shall be his duty to
"furnish all information called for, in relation to public
"schools.

"SECTION IV.—The Legislature shall establish a uniform sys-
"tem of public free schools throughout the State.

"SECTION V.—The Legislature, at its first session (or as soon
"thereafter as may be possible), shall pass such laws as will re-
"quire the attendance on the public free schools of the State
"of all the scholastic population thereof, for the period of at
"least four months of each and every year; provided, that
"when any of the scholastic inhabitants may be shown to have
"received regular instruction, for said period of time in each
"and every year, from any private teacher having a proper cer-
"tificate of competency, this shall exempt them from the opera-
"tion of the laws contemplated by this section.

"SECTION VI.—As a basis for the establishment and endow-
"ment of said public free schools, all the funds, lands, and
"other property heretofore set apart and appropriated, or that
"may hereafter be set apart and appropriated, for the support
"and maintenance of public schools, shall constitute the public
"school fund. And all sums of money that may come to this
"State hereafter, from the sale of any portion of the public do-
"main of the State of Texas, shall also constitute a part of the
"public school fund. And the Legislature shall appropriate all
"the proceeds resulting from sales of public lands of this State
"to such public school fund. And the Legislature shall set

" apart, for the benefit of public schools, one-fourth of the an-. " nual revenue derivable from general taxation ; and shall also " cause to be levied and collected, an annual poll tax of one " dollar, on all male persons in this State, between the ages of " twenty-one and sixty years, for the benefit of public schools. " And said fund, and the income derived therefrom, and the " taxes herein provided for school purposes, shall be a perpetual " fund, to be applied, as needed, exclusively for the education " of all the scholastic inhabitants of this State ; and no law " shall ever be made appropriating such fund for any other use " or purpose whatever.

" SECTION VII.—The Legislature shall, if necessary, in addi- " tion to the income derived from the public school fund, and " from the taxes for school purposes provided for in the fore- " going section, provide for the raising of such amount by tax- " ation, in the several school districts in the State, as will be " necessary to provide the necessary school-houses in each district, " and insure the education of all the scholastic inhabitants of " the several districts.

" SECTION VIII.—The public lands heretofore given to coun- " ties shall be under the control of the Legislature, and may be " sold under such regulations as the Legislature may prescribe ; " and in such case the proceeds of the same shall be added to " the public school fund.

" SECTION IX.—The Legislature shall, at its first session (and " from time to time thereafter, as may be found necessary), pro- " vide all needful rules and regulations for the purpose of car- " rying into effect the provisions of this article. It is made the " imperative duty of the Legislature to see to it, that all the " children in the State, within the scholastic age, are, without " delay, provided with ample means of education. The Legis- " lature shall annually appropriate for school purposes, and to " be equally distributed among all the scholastic population of " the State, the interest accruing on the school fund, and " the income derived from taxation for school purposes ; and " shall, from time to time, as may be necessary, invest the prin- ·

"cipal of the school fund in the bonds of the United States "government, and in no other security."

The very able argument of appellants' counsel strikes at the constitutionality of the one per cent. tax, upon the ground that the taxing power is an attribute of sovereignty delegated by the people to the Legislature, and incapable of being delegated by that body to the school directors. This argument might have great force in a given case, but the people of a State, in the enactment of their organic law, are not limited in the distribution of governmental powers, nor are they bound by the maxim *delegata potestas non potest delegare.* They may delegate the sovereign power of taxation to the Legislature, and by special provision authorize the Legislature to re-delegate that power to any agent, body politic, or corporation, named in the Constitution itself.

The 3d Section of the 9th Article of the Constitution especially provides, that the Legislature may give the district boards such *legislative* powers in regard to schools, school-houses, and school fund of the districts, as may be deemed necessary and proper. And it does appear to us that when these three objects are embraced, the whole ground assumed by the act of April 24th, 1871, is covered.

The taxing power is a legislative power, and as such, under this clause of the Constitution, may be delegated to these district boards; and inasmuch as they are recognized by the Constitution, we can see no difference in this behalf between them and municipal corporations, or any corporate bodies, to whom it is admitted the taxing power, or power under the law to make assessments, may be delegated.

But we do not consider the constitutionality of the school law as dependent upon this construction of our Constitution. The taxing power and the power of assessment should be carefully discriminated, and we do not think that the school law contemplates any thing beyond a power of assessment in the district boards. In the case of Hill *v.* Higdon, 5th Ohio State R., 243, the Supreme Court of that State, considering a question in

many respects analogous to the one now before us, say: " The " popular as well as legal signification of the term assessment " has always indicated those special and local impositions upon " property in the immediate vicinity of an improved street, " which were necessary to pay for the improvement, and laid " with reference to the special benefit which such property " derived from the expenditure of the money.

" And the fact that the Legislature may restrict these corpo-" rations in the exercise of this power, affords the strongest pos-" sible implication of the existence of the power." (1st Ohio State, 77, 126, 149.)

In the case before us the Legislature have restricted the assessment to one per cent. ; it is local, and intended for the benefit of those upon whom it is assessed.

The best lexicographers of our language tell us that the terms " levy " and " assessment " in law mean the same thing ; to assess this tax then was not an exercise of the taxing power. It is only a ministerial act, authorized by the Legislature, to whom the taxing power ordinarily and appropriately belongs.

We may well use the language of the Supreme Court of the State of Ohio employed in the case already referred to, for the purpose of more clearly stating our meaning : " It is our duty " to give such a construction to the Constitution as will make " it consistent with itself, and will harmonize and give effect to " all its various provisions. To do this, we have only to suppose " that the convention used language with reference to its popu-" lar and received signification, and applied it as it had been " practically applied for a long series of years.

" That where taxation is spoken of in the 2d Section of the " 12th Article, reference is made to the general burdens im-" posed for the purpose of supporting the government, and the " revenue raised expended for the equal benefit of the public at " large; while the power of assessment referred to in the 6th " Section of the 13th Article, although resting upon the taxing " power, was intended to describe a distinct and well-known " mode of laying a local burden upon particular property, with

" reference to the peculiar and special benefit derived to such
" property from the expenditure of the money."

That our opinion may be fully understood we make the law
under consideration an exhibit herein, which is as follows :
" An Act to Organize and Maintain a System of Public Free
   " Schools in the State of Texas.

   " SECTION I.—Be it enacted by the Legislature of the State of
" Texas, that the Superintendent of Public Instruction shall
" have supervisory control of all the public free schools in this
" State, and shall receive a salary of three thousand dollars per
" annum. He shall keep a record of the number of children in
" each county, of scholastic age, from six to eighteen years of
" age ; apportion the money of the school fund of the State to the
" several counties according to the scholastic population. He
" shall keep a correct account of all moneys of the school fund
" and matters appertaining thereto, and report to the Governor
" annually, at the close of the fiscal year, the condition of the
" school fund, distributions of moneys, and such suggestions in
" regard to the school system as may be deemed advisable.
" The fiscal scholastic year shall be the same as the fiscal year of
" the Treasury. He shall prescribe and furnish all necessary forms
" for teachers and all other subordinate officers of the Bureau of
" Education, and he shall direct the manner and times of mak-
" ing reports by those officers and persons, and shall examine
" and approve all accounts for compensation of teachers and em-
" ployes of the Bureau of Education, and for school-books and
" apparatus purchased for public schools before the same shall
" be paid at the. Treasury.

   " SECTION II.—The Superintendent of Public Instruction,
" with the approval of the Governor, shall appoint for each judi-
" cial district of this State, one supervisor of education for such
" judicial district, who shall hold his office for four years, unless
" sooner removed. Each supervisor of education shall receive,
" as compensation, the sum of five dollars per day for the time
" actually employed in attending to the duties of his office ; pro-
" vided, that the total to be paid to any supervisor during any one

" year shall not exceed the sum of twelve hundred dollars. The
" supervisors of education may be removed by the Superintend-
" ent of Public Instruction, on the approval of the Governor,
" for incompetency, malfeasance, or neglect of duty. The super-
" visors of education shall be empowered to lay off and subdi-
" vide the counties of their respective judicial districts into
" school districts, and shall be empowered to appoint five school
" directors for each school district; but the authority of the
" supervisors in these respects shall be subject to the control and
" revision of the Superintendent of Public Instruction. It shall
" be the duty of the supervisors to enforce, in their respective
" districts, all rules and regulations adopted by the Board of
" Education for the government of public free schools in this
" State.

" SECTION III.—The Superintendent of Public Instruction,
" with the Governor and the Attorney-General, shall form a Board
" of Education for the State. It shall be the duty of this board,
" subject to the Constitution and laws of this State, to adopt all
" necessary rules and regulations for the establishment and pro-
" motion of public schools; to provide for the examination and
" appointment of teachers, and to fix their compensation; to
" define the course of studies in the public schools, and direct
" the class and kind of apparatus and books to be used therein;
" to prescribe the duties of the boards of directors, and generally
" do all things not inconsistent with the Constitution and laws of
" this State necessary to establish and maintain a system of pub-
" lic free schools; provided, that the Board of Education for
" this State shall prescribe no rule or regulation that will prevent
" the directors of the school districts from making any separation
" of the students that the peace and success of the school and
" the good of the whole may require.

" SECTION IV.—The Board of Education for the State shall re-
" port for action of the Legislature, from time to time, such
" amendments of the school laws of this State as may be found
" necessary, stating in their report the facts and reasons which, in
" their opinion, render necessary such proposed amendments.

" SECTION V.—The available school fund, liable to appropria-
" tion for the support of public schools, is hereby declared to be
" all interest which has accrued, or may hereafter accrue, to the
" school fund from railroads or otherwise, since the 30th day
" of March, 1870, one-fourth of all the *ad valorem* and occupa-
" tion taxes assessed since that date, and such other taxes as
" have been or may be provided by law for the support of pub-
" lic schools.   Accounts against this available school fund shall
" be paid out of any part of it that may be in the Treasury, on
" appropriation therefor by the Legislature.   The directors of
" each school district shall have authority to levy a tax of not
" exceeding one per cent., for the purpose of building school-
" houses and maintaining schools in their respective school dis-
" tricts ; and the manner of the collection and disbursement of
" this tax shall be prescribed by the Board of Education for the
" State.

" SECTION VI.—The board of school directors shall require the
" attendance on the public schools of their respective districts,
" of all the scholastic population thereof, for a term of at least
" four months of each and every year ; and should any of said
" scholastic population neglect or refuse to attend said schools,
" each and every parent or guardian of such child or ward neg-
" lecting or refusing to attend shall be deemed guilty of a mis-
" demeanor, and upon trial and conviction thereof before any
" court of competent jurisdiction, shall be fined in a sum not to
" exceed twenty-five dollars for each and every such offense, and
" shall pay the costs of the prosecution ; and all moneys collect-
" ed for fines, under the provisions of this section, shall be paid
" into and become a part of the public school fund of the dis-
" trict where the penalty was incurred ; provided, that when
" any child or ward of scholastic age may be shown to have re-
" ceived regular instruction from any private teacher having a
" proper certificate of competency, or when it may be shown
" that said child or ward was prevented by ill health from at-
" tending school, or that there was no public school within three
" miles of the residence of said child or ward, or that said ab-

" sence was caused by reason of danger from hostile Indians—
" this shall exempt them from the operation of the penalty con-
" templated by this section; and further provided, that nothing
" in this act shall be so construed as to compel the attendance of
" a child under ten years of age on the public free schools, when
" there is no school established within one mile of the residence
" of said child or ward.

" SECTION VII.—That all laws and parts of laws not consistent
" with this act be, and the same are hereby repealed, and that
" this act take effect and be in force from and after its passage.

" Approved April 24, 1871."

It is not for us to say whether the provisions of this law have been carefully considered by the Legislature, or whether they are wise or unwise. The responsibility of the law, if unwise, rests not upon us, nor are we entitled to the honor which it may confer upon its authors. It is for us to say whether it is in accordance with the principles and provisions of our Constitution, and whether its details can be carried out.

The Constitution confers upon the Legislature the power, and imperatively requires it as a duty, that a system of common schools shall be organized throughout the State. At least the elements of an education are placed within the reach of all classes of the people, and we believe the laws under consideration to be · in harmony with the Constitution, and that they should be carried out with the utmost strictness and good faith.

The judgment of the District Court is therefore affirmed.

EVANS, P. J. This case is of such importance that while I concur in the judgment that is rendered, and in the general views presented in the opinion of the court, I deem it proper to state, with some distinctness, my own views upon the subject involved; and I am the more inclined to do this because the opinion is entertained by perhaps a majority of the members of the bar throughout the State, that the act of the Legislature, by authority of which the one per cent. school tax is collected, is not warranted by the Constitution.

The act in question is entitled "An Act to Organize and "Maintain a System of Public Free Schools." The 5th Section of the act provides that "the school directors of each school " district shall have authority to levy a tax of not exceeding one " per cent., for the purpose of building school-houses and main- " taining schools in their respective school districts." The au- thority for the delegation of the taxing power given by this sec- tion to the boards of school directors, is to be found in Section 3, Article 9, of the Constitution. It is there provided that " The Legislature may lay off the State into convenient school " districts, and provide for the formation of a board of school " directors in each district. It may give the district boards such " legislative powers in regard to the schools, school-houses and " school fund of the district, as may be deemed necessary and " proper."

These boards of school directors, when formed, become *quasi* corporations; and there can be no doubt that it was the pur- pose of the framers of the Constitution to empower the Legis- lature to clothe these boards with full powers in relation to the subjects enumerated. It would be a very narrow construction of the language used in the 3d Section of the 9th Article of the Constitution, to say that the Legislature was not authorized to confer upon these boards the power of taxation—a construction at variance with the general scope of that Article of the Con- stitution.

I do not feel that my official position imposes upon me any obligation to ignore the fact that there is a wide-spread dissatis- faction throughout the State with our public school system; and that this dissatisfaction is not confined exclusively to any political party. But I am of opinion that the criticism of the system that is indulged in both by the people and the members of the legal profession, should be directed against the Constitu- tion rather than the acts of the Legislature passed in pursuance of its spirit. A careful consideration of the 9th Article of the Constitution will disclose the fact, that its framers contemplated a gigantic system of compulsory education, without parallel in

the American Union, or perhaps in the world, in the extent of the revenues to be raised for its support, and in the amplitude and splendor of its machinery and appointments.

Section 1 of the Article provides that "It shall be the duty "of the Legislature of this State, to make suitable provisions "for the support and maintenance of a system of public free "schools, for the gratuitous instruction of all the inhabitants of "this State between the ages of six and eighteen years."

The scholastic age is thus made to cover a period of twelve years.

Section 5 of the Article provides that "The Legislature, at "its first session (or as soon thereafter as may be possible), shall "pass such laws as will require the attendance on the public "free schools of all the scholastic population thereof, for the "period of at least four months of each and every year: pro- "vided that, when any of the scholastic inhabitants may be "shown to have received regular instruction for said period of "time in each and every year, from any private teacher having "a proper certificate of competency, this shall exempt them "from the operation of the laws contemplated by this sec- "tion."

The accomplished young lady who returns at the age of six- teen, with her diploma, from the best school of the country, to her home in Texas, finds herself still a school-girl, required to go to a public school four months in each year, or receive regu- lar instruction from a private teacher, having a proper certificate of competency, for the same length of time, until she is eight- een years of age.

Section 2 of the Article of the Constitution referred to, pro- vides for the appointment of a Superintendent of Public In- struction; and Section 3 provides that this officer "shall rec- "ommend to the Legislature such provisions of law as may be "found necessary, in the progress of time, to the establishment "and perfection of a complete system of education, adapted to "the circumstances and wants of the people of this State." The establishment and perfection of a complete system of edu-

cation, involving the compulsory attendance of the children of the State upon the schools, for at least four months in every year, for twelve years, are the leading features of this Article of the Constitution. A degree of intellectual cultivation and development is aimed at which will make high-schools, colleges, and universities a necessary part of the system.

A large school fund is provided. Section 6 of the Article is as follows: "As a basis for the establishment and endowment "of said public free schools, all the funds, lands, and other "property heretofore set apart and appropriated, or that may "hereafter be set apart and appropriated for the support and "maintenance of public schools, shall constitute the public "school fund. And all sums of money that may come to this "State hereafter, from the sale of any portion of the public do-"main of the State of Texas, shall also constitute a part of the "public school fund; and the Legislature shall appropriate all "the proceeds resulting from sales of public lands of the State, to "such public school fund; and the Legislature shall set apart, "for the benefit of public schools, one-fourth of the annual "revenue derivable from general taxation; and shall also cause "to be levied and collected an annual poll tax of one dollar, on "all male persons in this State, between the ages of twenty-one "and sixty years, for the benefit of public schools. And the "said fund, and the income derived therefrom, and the taxes "herein provided for school purposes, shall be a perpetual fund, "to be applied as needed, exclusively for the education of all "the scholastic inhabitants of this State, and no law shall ever "be made, appropriating such fund for any other use or purpose "whatever."

Section 7 provides, that "the Legislature shall, if necessary, "in addition to the income derived from the public school fund, "and from the taxes for school purposes provided for in the "foregoing section, provide for the raising of such amount by "taxation, in the several school districts in the State, as will be "necessary to provide the necessary school-houses in each dis-

"trict, and *insure the education* of all the scholastic inhabitants "of the several districts."

This section gives a power of taxation which is by no means exhausted by the act of the Legislature authorizing the one per cent. tax. The power of taxation is commensurate with the magnitude of this scheme of education.

And the fact must not be overlooked that the framers of the Constitution manifested an active solicitude, that those of the scholastic age who had never enjoyed any of the advantages of education, should receive instruction as soon as possible.

Section 9, Article 9, of the Constitution, contains the following injunction to the Legislature: "It is made the imperative "duty of the Legislature to see to it that all the children in the "State, within the scholastic age, are without delay provided "with ample means of education." It was intended especially to benefit those who had grown up in slavery and ignorance, and who were approaching the age of eighteen years, after which the benefits of the schools could not be enjoyed.

Now, whether this Article of our Constitution be wise or not, whether compulsory education by the State accords with the principles of good government, it is not the province of this court to inquire. Neither courts nor legislatures, organized under the authority of the Constitution, have any discretion but to carry into effect its several provisions.

I was a member of the convention which framed this Constitution, and presented it to the people. I did not approve of all of the provisions contained in Article 9, in relation to public schools, as the record of the convention will show. But I deemed the crisis so urgent, the necessity for a restoration of the State to constitutional relations with the Federal Union so overwhelming, that I did not feel at liberty to resist the adoption of the Constitution, because of my personal objections to its provisions.

As a member of this court, in common with my associates, I feel it to be my imperative duty to carry into effect all the provisions of the Constitution, not to evade them or construe them

away. I feel at liberty, nevertheless, to say that, in my opinion, Article 9 of our Constitution is in its spirit in conflict with the true philosophy of popular or republican government.

It places it in the power of the State, by adopting a very high standard of public education, to take from the people more of their substance than is needful to the maintenance of their rights, and the promotion of their happiness and welfare. It authorizes too great an interference by the State with the divinely-appointed means for the training and elevation of the race; that means being the mysterious, but natural, powerful, and universal combination of parental affections and interest.

I only indicate my objections to the Constitution; I do not discuss them.

I think it also proper to say that if the Legislature, in attempting to carry into effect the provisions of Article 9 of the Constitution, has created a machinery inadequate to that end, and so defective as to fail in the accomplishment of the intended purpose, the legislation would be unconstitutional; and in that case, the courts ought to interfere by injunction to prevent the collection of money from the people, which cannot, for the want of efficient laws and agencies, be beneficially expended. But the record in this case does not present any question of this nature for our consideration, and when we look beyond the record to what is matter of history, we know that in some portions of the State, at least, the school system is successfully and beneficially administered.

The faults of administration, therefore, in other districts, if there be faults, are not so much chargeable to the law as to other causes.

It may be that in some portions of the State the popular prejudice is so great against the public school system, that capable and faithful agents cannot be found to administer the law. The remedy for such an evil is with the people themselves.

The successful working of any law depends at last upon the willingness of the people to coöperate with the agents of the law, in its administration. Those who are by education, by

probity of character, and by permanent interest in the prosperity of the State, qualified to control the public schools, and to direct the expenditure of the school fund in such manner as to make the system conducive to the public good, cannot acquit themselves of the charge of neglect of duty, if they, out of prejudice against the public school system, permit its administration to fall into the hands of designing and incapable men.

I have said this much in the hope that it may lead to reflection.

I concur in the decision of the court.

Affirmed.