P. J. WILLIS & BROTHER v. JOSEPH A. OWEN, SHERIFF, AND OTHERS.

APPEAL from Galveston.

M. KENNEDY v. JOHN MCCLANE, SHERIFF.

APPEAL from Nueces.

M. KENNEDY AND OTHERS v. WM. SCANLAN, SHERIFF.

APPEAL from Cameron.

T. H. CLARK AND OTHERS v. JOHN MCCLANE, SHERIFF.

APPEAL from Nueces.

A. W. & E. P. CLEGG v. THE STATE OF TEXAS.

APPEAL from Galveston.

EDWARD T. AUSTIN v. THE STATE OF TEXAS.

APPEAL from Galveston.

GALVESTON, HARRISBURG AND SAN ANTONIO RAILWAY CO. v. THE STATE OF TEXAS.

APPEAL from Harris.

THESE cases involve the legality of the *one per cent.* school-tax levied throughout the State for the year 1871.

The case, as made in the first-named appeal, is given.

1. STARE DECISIS. The rule of *stare decisis* applies when a decision has been recognized as a law of property, and conflicting demands have been adjusted, and contracts made with reference to and on faith of it; but not to questions involving the construction and interpretation of the organic law, the structure of the government, and the limitations upon the legislative and executive power as safeguards against tyranny and oppression.

2. SCHOOL-DISTRICTS. The Constitution requires the State to be divided into convenient school-districts, and boards of school directors appointed for such districts, to whom important legislative powers may be intrusted; there is nothing tending to show that this power could be delegated to the superintendent of public instruction or other officers.

3. THE SUPERINTENDENT OF PUBLIC INSTRUCTION is an executive officer, and his duties belong to the executive character.

4. Nor can the Legislature deprive the superintendent of his constitutional power by requiring its exercise in conjunction with some other officer.

5. It is evident that the *school-districts* (formed by laying off the State into convenient districts) are the basis of the school-system contemplated in the Constitution. The local boards of directors and the superintendent of public instruction are intended to be the leading and essential factors in the school-system.

6. When the school-districts have been so formed, the legislative power allowed to be delegated to them must be really vested in them; it cannot be vested in some other tribunal.

7. The Legislature cannot delegate any of its powers unless authorized to do so by the Constitution; such delegation of power for the support and maintenance of public schools can only be made to the local boards; any other powers exerted to this end by the Legislature, must be exercised directly by it.

8. The Legislature could give the district boards legislative power to manage the accrued school-funds of the districts, and the question of how much deficiency was necessary for building-school-houses and supporting schools, and the levy of a tax for such deficiency by such boards as *quasi* corporations.

9. The machinery of the district boards is necessary in ascertaining the wants of each district, and to that end, the Constitution provides for raising such sum by taxation in the several school-districts "as will be "necessary" for school-purposes.

10. The determination of the amount of the levy, within the maximum fixed by the Legislature, by the district boards, may be regarded as the exercise of legislative powers in regard to the school-fund of the district.

11. By the school-system adopted by the Legislature, April 24, 1871, the functions and duties of the superintendent and of the district boards are

taken from them and conferred upon a board of education created by this law, consisting of the superintendent of public instruction, Governor, and attorney-general.

12. By the Constitution, the superintendent of public instruction has the supervision of the public free schools, is required to perform such other (executive) duties as the Legislature may require, to recommend needful amendments to the school-laws, and to report to each session of the Legislature the condition of the schools. By the statute, these powers are conferred on the board of education, besides *other* duties, such as forming rules for the government of schools, examination of teachers and their compensation, the studies to be pursued, and the authority to prescribe the manner of collecting and disbursing the one per cent. school-tax.

13. This statute, and the regulations of the board of education, confer the power of taxation and the mode of its collection nominally upon the district board of directors, but it is really retained and exercised by the board of education.

14. Discussion of the "rules" and circulars of the board of education, as compared with the school-system contemplated by the Constitution.

15. The authority conferred by this statute upon the board of education, and the right to collect this tax, cannot be sanctioned unless authority be shown in a plain and unequivocal warrant in the Constitution granting these powers. "This," the court says, "cannot be done."

16. *Held*, that neither the Governor nor attorney-general, consistently with the limitations and restrictions in the Constitution, can become members of the board of education, or discharge the duties pertaining thereto.

17. The members of the board of education, besides having legislative authority, are officers or hold agencies of public trust, and which cannot be held or exercised by such officers as are prohibited from holding two offices, agencies, etc., by the Constitution.

18. Powers of the board of education enumerated, which are held to be legislative, and which, while they may be transacted through other instrumentalities, cannot be delegated to officers in the executive department of the government.

19. The one per cent. school-tax was not levied by directors of such school-districts as was comtemplated by the Constitution.

20. The act of April 24, 1871, indicates the agencies for, and requires them to subdivide the State into convenient school districts, but these agents have not, in fact, exercised the legal discretion intrusted to them, but have acted altogether under the control of the board of education.

21. The supervisors appointed under this act either divided their territory, by designating each county as a school-district, or they adopted the division as made under the act of August 13, 1870. This cannot be regarded as a legal subdivision of the State into convenient school-districts.

22. The act of August 13, 1870, creating each county a school-district, was

modified by the act of 1871, providing that the supervisors should sub-
divide their territory. The amendments were not recognized or acted
upon in this regard by the board of education.

23. Kinney *v.* Zimpleman, 36 Texas, 564, overruled.

P. J. Willis and Richard S. Willis, as partners under the
firm-name of P. J. Willis & Bro., filed their petition in the
District Court, praying in their own behalf, and in behalf of
others of like interests, for a writ of injunction, to restrain the
sheriff of Galveston county, and the Board of Education, and the
Board of School Directors of Galveston county from proceed-
ing to collect from petitioners and others who might be per-
mitted to become parties plaintiff, the school-tax of one per
cent., the one-eighth of which was levied under the act
entitled, "An Act to give effect to the several provisions of the
"Constitution, concerning taxes," of April 22, 1871, and the
other seven-eighths being claimed under the act entitled, "An
"Act to organize and maintain a system of public free schools
"in the State of Texas," of April 24, 1871. The District
Judge, in his fiat granting the writ, refused to grant the writ
against the collection of the first-named tax of one-eighth of one
per cent., and granted the writ against the collection of the lat-
ter-named tax of seven-eighths of one per cent., upon condition
that petitioners pay the tax of one-eighth of one per cent.

The District Judge refused to grant the writ in favor of the
petitioners and all others of like interest, and granted the writ
in favor of the petitioners, P. J. Willis & Bro.

The petitioners paid to the sheriff of Galveston county, the
tax of one-eighth of one per cent., amounting to the sum of four
hundred and thirty-one dollars and twenty-five cents, in com-
pliance with the fiat of the District Judge, and the writ issued.

The petition alleged, among other things, in substance, that
the sheriff had levied upon and seized personal property of pe-
titioners to the value of two thousand six hundred and twenty-
five dollars, to pay said tax on their personal property, and had
threatened to institute suit against them to recover the tax

upon their real estate, as directed by the Board of Education, and that said tax, for which a lien was claimed on the real estate of petitioners, and the institution of such suit, constituted a cloud upon the title of said real estate. The sheriff of Galveston county had given no bond for the faithful collection of this tax, and was not able to respond in damages to petitioners and others of like interests, for the collection of this tax. That the tax of seven-eighths of one per cent. claimed under the school-law of April 24, 1871, had never been assessed. That the sheriff had no authority for the collection of said tax, other than instructions from the Board of Education.

That the Board of Education is organized in contravention of Section 1, Article 2, and Section 30, Article 3, and Section 14, Article 4, of the Constitution. That the orders, rules, and regulations of this board are legislative in their character, and are illegal, and furnish no authority to the sheriff for the collection of said tax. That the county of Galveston has not been sub-divided into school-districts, and that the Legislature could not delegate to these boards, as organized, the power to levy the tax sued for. That the Board of Education, and not the Board of School Directors of Galveston county, have levied this tax, if any tax has been levied. That the school-law of April 24, 1871, was unconstitutional, and was not a law of the land, because not read on three several days in the House of Representatives while on its passage through the Legislature, and the constitutional rule was not dispensed with by any vote of the house.

The defendants appeared, and moved to dissolve the injunction for want of equity in plaintiffs' petition. The court sustained the motion ; dissolved the injunction, and dismissed the petition.

The allegations of appellants' petition, entitling them to relief, raise the following points, which are insisted on in their briefs :

*First.* That the sheriff of Galveston county has no authority to collect this tax.

And herein: 1st, because it is no part of his duty as the collector of State taxes.

2d. The Board of Education could not legislate to impose this duty on the sheriff.

3d. The Board of Education is organized in violation of Section 1, Article 2, Section 30, Article 3, Section 14, Article 4, Section 42, Article 12, of the Constitution.

*Second.* That the school-system as organized under the acts of April 24 and November 29, 1871, is not provided with local boards of directors, having the legislative powers enumerated in Section 3, Article 9, Constitution ; but, on the contrary, the system as organized is a creation of the Legislature, intricate and cumbersome in its machinery, and so constructed as to withdraw from the district school-boards all discretionary and legislative power, and to make them, in regard to the levy, collection, and disbursement of this tax, simply the mouth-piece of the Board of Education.

*Third.* That the Legislature did not divide the State into districts, as directed by Section 3, Article 9, but intrusted that duty to the Supervisors, and that the Supervisors disobeyed the laws of April 24, and November 29, 1871, refused to sub-divide the counties into districts, and created the counties into districts. For these reasons the boards of school directors appointed to these districts by the Supervisors are held to be illegal.

*Fourth.* That Sections 3 and 7, Article 9, Constitution, do not authorize the Legislature to delegate to the district boards the taxing power.

*Fifth.* That the act of April 24th, 1871, under which this tax is claimed to be levied, is unconstitutional and void. 1st, because it was passed without the three readings required by the constitutional rule, Section 24, Article 3, and without suspension of said rule.

2d, because there was no great emergency, and the bill could not be thus irregularly passed even under a suspension of the rule.

*Sixth.* That this tax has never been assessed against the property of appellants.

*Franklin & Trezevant, Ballinger, Mott & Jock, Robert M. Franklin, and C. S. West,* for appellants.

*Sheeks & Sneed,* for appellees. This case involves the question of the constitutionality of the law under which the Board of School Directors levied the one per cent. school-tax, and the legality of their acts in relation to that tax in Galveston county. The constitutionality of the law and the action of the board were sustained by the District Court.

We think that the following authorities show clearly that the ruling of the District Court was correct :

(Kinney *v.* Zimpleman, 36 Texas, 554; Hall *v.* H. & T. C. R. R. Co.; Scanlan *v.* Galvan; 7 Kan. R., 274; 14 Wis. R., 619; 21 Penn. R., 147; 9 Blackf., 266; 5 Blackf., 258; 1 Blackf., 165; 6 Crouch, 87; Cooley's Constitutional Limitations, 168, 171, 182; 1 Kan. R., 18; 4 Kan. R., 124, 141; 7 Kan. R., 498; 5 Mich., 257; 13 Mich., 162, 501; 4 Peters, 514; 11 Peters, 421; 4 Wall., 210; Peaz *v.* Talbott and Peaz *v.* Dimmitt, 39 Texas, 335.)

On the point as to whether the law was read the proper number of times and other provisions of the Constitution as to the mode of passing laws were complied with, and the effect of such non-compliance, etc., etc., in support of the ruling of the court below, we refer to The State *ex rel.*, etc., *v.* Young, 5 Am. Law Reg. (N. S.), 679; R. R. Co. *v.* Governor, 23 Mo., 353; Dancombe *v.* Prindle, 12 Iowa, 1; Eld *v.* Gorham, 20 Conn. 8; Touke *v.* Fleming, 13 Md., 392; People *v.* Supt. of Chenango, 4 Selden, 317; People *v.* Develin, 33 N. Y., 269; Evans *v.* Brown, 30 Ind., 514.

The English authorities are to the same effect.

So far this court has continually upheld the law and authorized the collection of the tax.

Nearly all the small property-holders of the State have paid

the tax. *Stare decisis* in this instance imports justice to the many who have paid by compelling the few who have not paid, but are taking advantage of their wealth to keep the tax-gatherer at bay, to pay.

MOORE, J. The proper determination of each of these cases depends upon the validity or invalidity of the "Act to organ-"ize and maintain a system of public schools," approved April 24, 1872, and the authority conferred thereby to collect the taxes brought in question in them. The constitutionality of this law and the liability of the tax-payers for these taxes, has been sustained by this court in the cases of Kinney *v.* Zimpleman (36 Texas, 554; Bremond *v.* The State, 38 Texas, 116; Hall *v.* H. & T. C. R. W. Co., 39 Texas, 286; Ireland *v.* Gordon, 39 Texas, 253), and perhaps in others in which the opinion of the court has not been published. It may, therefore, be thought that the question should not be regarded by us as now open for discussion,—that whatever might be our views, in respect to it, upon the principal of *stare decisis*, we should hold it as definitely settled and concluded.

We cannot, however, regard the rule of *stare decisis* as having any just application to questions of the character involved in these cases. This doctrine grows out of the necessity for a uniform and settled rule of property, and definite basis for contracts and business transactions. If a decision is wrong, it is only when it has been so long the rule of action, as that time and its continued application as the rule of right between parties demands the sanction of its error. Because, when a decision has been recognized as the law of property, and conflicting demands have been adjusted, and contracts have been made with reference to and on faith of it, greater injustice would be done to individuals, and more injury result to society by a reversal of such decision, though erroneous, than to follow and observe it. But when a decision is not of this character, upon no sound principle do we feel at liberty to perpetuate an error, into which either our predecessors or ourselves may have unad-

visedly fallen, merely upon the ground of such erroneous decision having been previously rendered.

The questions to be considered in these cases have no application whatever to the title or transfer of property, or to matters of contract. They involve the construction and interpretation of the organic law, and present for consideration the structure of the government, the limitations upon legislative and executive power, as safeguards against tyranny and oppression. Certainly, it cannot be seriously insisted, that questions of this character can be disposed of by the doctrine of *stare decisis*. The former decisions of the court in such cases are unquestionably entitled to most respectful consideration, and should not be lightly disregarded or overruled. And in case of doubtful interpretation, a long-settled and well-recognized judicial interpretation, or even legislative or executive construction within the sphere of their respective functions, might be sufficient to turn the balanced scale. But in such case the former decision or previous construction is received and weighed merely as an authority tending to convince the judgment of the correctness of the particular conclusion, and not as a rule to be followed without inquiry into its correctness.

An additional reason why we do not feel at liberty to dispose of these cases on the authority of the decisions to which we have referred in similar cases, is, that we do not think the most vital objection to the right to collect the tax in question has been discussed or passed upon by the court in any of these cases. Indeed, if all the points discussed in the previous opinions were conceded to be correctly decided, it is, in our view of the matter, susceptible of demonstration that the judgments are erroneous.

That our views in relation to the authority to levy and collect a school-tax may not be misunderstood, we deem it proper to say, that while we do not by any means concur in all of the positions assumed in the opinions of the court in these cases, neither do we dissent from some of the most important of them. And while it is unnecessary for us at present to indicate particu-

larly those with which we agree and those from which we dissent, we desire to be understood as expressing an opinion only in reference to those to which we may have occasion to make direct reference.

It certainly cannot be doubted " that the framers of our Con-
" stitution regarded it as one of the highest and most sacred
" duties incumbent on their body to make plenary provision
" for a system of common schools, to be inaugurated throughout
" the State by the Legislature under wise and wholesome laws."
Nor can it be questioned, that the provisions made by the Convention for the support and maintenance of the system of public free schools so to be inaugurated, was as liberal and ample as the most ardent advocate of such schools could desire. But whether the school-system devised and inaugurated by the Legislature, by the act approved April 24, 1871, heretofore referred to, was such as is authorized by the Constitution, or indeed whether the system inaugurated and put in operation by the Board of Education created by said act, was such as is provided for in the Constitution, or was warranted by said act, are altogether different questions. To answer them, it is necessary to contrast the provisions of the Constitution bearing upon the subject with the act of the Legislature in question, and the school-system inaugurated under it.

Without quoting them in full, we cite some of the constitutional provisions with which this act, and the school-system so inaugurated, are to a greater or less extent in conflict. Section 1, Article 2, of the Constitution, divides the powers of government into three distinct departments, executive, legislative, and judicial, and confides the duties of each of them to a separate body of magistracy, and absolutely forbids any person or collection of persons, being of one of these departments, exercising any power properly belonging to either of the others, unless expressly authorized in the Constitution. By Section 3, Article 3, the legislative power of the State is vested in two branches or bodies of magistracy, one styled the House of Representatives, the other, the Senate, and both together the " Leg-

"islature of the State of Texas." Section 1, Article 4, provides that the executive department shall consist of a chief magistrate, styled the Governor, a lieutenant-governor, secretary of state, comptroller of public accounts, treasurer, commissioner of the general land office, attorney-general, and superintendent of public instruction. The constitutional functions and duties of the Governor are indicated in the succeeding sections of this article, while Section 14 of it absolutely inhibits his holding any other office or commission. The constitutional functions and official duties of the attorney-general are also specified in Section 23 of the same article. Without undertaking to enumerate all of the powers and duties assigned to the office of governor and attorney-general in the Constitution, or those conferred by its authority, we may remark, that they seem to be altogether of a different character from those belonging to the office of superintendent of public instruction, which are enumerated in Section 3, of Article 9. And Section 30, of Article 3, declares that certain enumerated officers, among them the attorney-general, nor any person holding a lucrative office under the United States, or this State, or any foreign government, shall at the same time hold or exercise any two offices, agencies, or appointments of trust or profit under this State, except in the particularly enumerated instances therein mentioned.

That the character of the school-system contemplated and authorized by the Convention may more clearly be perceived, we will here insert at length Article 9 of the Constitution on the subject of public schools, viz. :

"Section 1. It shall be the duty of the Legislature of this "State to make suitable provisions for the support and main-"tenance of a system of public free schools, for the gratuitous "instruction of all the inhabitants of this State, between the "ages of six and eighteen years.

"Section 2. There shall be a superintendent of public in-"struction, who after the first term of office shall be elected by "the people; the first term of office shall be filled by appoint-"ment of the Governor, by and with the advice and consent of

" the Senate.   The superintendent shall hold his office for the
" term of four years.   He shall receive an annual salary of
" two thousand five hundred dollars, until otherwise provided
" by law.   In case of vacancy in the office of superintendent,
" it shall be filled by appointment of the Governor, until the
" next general election.

  " Section 3.  The superintendent shall have the supervision
" of the public free schools of the State, and shall perform
" such other duties concerning public instruction as the Legis-
" lature may direct.   The Legislature may lay off the State
" into convenient school-districts, and provide for the forma-
" tion of a board of school-directors in each district.   It may
" give the district boards such legislative powers, in regard to the
" schools, school-houses and school-fund of the district, as may
" be deemed necessary and proper.   It shall be the duty of the
" superintendent of public instruction to recommend to the
" Legislature such provisions of law as may be found necessary,
" in the progress of time, to the establishment and perfection
" of a complete system of education, adapted to the circum-
" stances of the people of the State.   He shall at each session
" of the Legislature furnish that body with a complete report
" of all the free schools in the State, giving an account of the
" condition of the same, and the progress of education within
" the State.   Whenever required by either house of the Legis-
" lature, it shall be his duty to furnish all information called
" for in relation to public schools.

  " Section 4.  The Legislature shall establish a uniform sys-
" tem of public free schools throughout the State.

  " Section 5.  The Legislature at its first session (or as soon
" thereafter as may be possible), shall pass such laws as will
" require the attendance on the public free schools of the State
" of all the scholastic population thereof, for the period of at
" least four months of each and every year; provided that
" when any of the sholastic inhabitants may be shown to have
" received regular instruction, for said period of time in each
" and every year, from any private teacher having a proper

Opinion of the Court.

" certificate of competency, this shall excuse them from the
" operation of the laws contemplated by this section.

" Section 6. As a basis for the establishment and endowment
" of said public free schools, all the funds, lands and other
" property hereafter set apart and appropriated, or that may
" hereafter be set apart and appropriated for the support and
" maintenance of public schools, shall constitute the public
" school fund. And all sums of money that may come to this
" State hereafter from the sale of any portion of the public
" domain of the State of Texas, shall also constitute a part of
" the public school fund. And the Legislature shall appro-
" priate all the proceeds resulting from the sales of lands of
" this State to such public school fund. And the Legislature
" shall set apart for the benefit of public schools, one-fourth of
" the annual revenue derivable from taxation ; and shall also
" cause to be levied and collected an annual poll-tax of one
" dollar, on all male persons in the State, between the ages of
" twenty-one and sixty, for the benefit of public schools, and
" said fund and the income derived therefrom, and the taxes
" herein provided for school-purposes, shall be a perpetual
" fund, to be applied exclusively to the education of all the
" scholastic inhabitants of this State ; and no law shall ever be
" made appropriating said fund for any other use or purpose.

" Section 7. The Legislature shall, if necessary, in addition
" to the income derived from the public school fund and from
" the taxes for school-purposes provided for in the foregoing
" section, provide for the raising of such amount by taxation, in
" the several school-districts in the State, as will be necessary
" to provide the necessary school-houses in each district and
" insure the education of all the scholastic inhabitants of the
" several districts.

" Section 8. The public lands heretofore given to counties
" shall be under the control of the Legislature, and may be sold
" under such regulations as the Legislature may prescribe, and
" in such case the proceeds of the same shall be added to the
" public school fund.

" Section 9. The Legislature shall, at its first session (and
" from time to time thereafter as may be found necessary), pro-
" vide all needful rules and regulations for the purpose of car-
" rying into effect the provisions of this article.   It is made
" the imperative duty of the Legislature to see to it that all the
" children of the State within the scholastic age, are, without
" delay, provided with ample means of education.   The Legis-
" lature shall annually appropriate for school-purposes, and to
" be equally distributed among all the scholastic population of
" the State, the interest accruing on the school-fund and the
" income derived from taxation for school-purposes, and shall
" from time to time, as may be necessary, invest the principal
" of the school-fund in the bonds of the United States Govern-
" ment, and in no other security."

Among the marked features of the public school system in-
tended to be created by the Convention, it is quite apparent
from this article that it was intended, while sufficiently broad
to afford the means of education to every child in the State
within the scholastic age, to establish a system in respect to
some of its most important and vital essentials, if not all of
them, which should be local in its character.   The State is to
be divided into convenient school-districts, and boards of school
directors appointed for such districts, to whom important legis-
lative powers may be intrusted, while there is nothing in the
slightest degree tending to warrant an inference that such or
like powers may be delegated to the superintendent or other
officers who may be created by the Legislature for the purpose
of carrying into effect and securing the better maintenance of
such system.

To the superintendent, as the central head and executive offi-
cer of the system, is committed a general power of supervision
over the schools throughout the State, with such duties con-
cerning public education as may be intrusted to him by the Legis-
lature.   Such duties, from the fact of his being an officer of the
executive department, must be of an executive character, while
those conferred upon the boards of directors are legislative.   It

cannot be insisted that because the Legislature may require the superintendent to discharge other duties concerning public instruction than those specifically mentioned, that there is no restriction as to their nature and character. To do so would violate the established canon of construction, that, in determining the true import of a given section or clause of the Constitution, like any other instrument, regard must be had to all its provisions, and that it must be interpreted so that all its parts may be in harmony and have effect. Hence, specific, clear, and direct grants or limitations of power, are not controlled or annulled by general provisions found in other parts of the instrument.

It is also quite obvious that none of the constitutional powers or functions of the superintendent can be taken from him, absolutely or in a qualified manner, by requiring him to exercise them in conjunction with some other officer.

Bearing these observations in mind, let us look to some of the provisions of the act to organize and maintain a system of public free schools, approved April 24, 1871, and the act supplementary and amendatory of it, approved November 29, 1871, and consider, in the same connection, the school-system actually organized and maintained under authority of these laws.

Section 2 of the first of these acts says: " The superintend-
" ent of public instruction, with the approval of the Governor,
" shall appoint, for each judicial district of this State, one super-
" visor of education for such judicial district, who shall hold his
" office for four years, unless sooner removed. Each super-
" visor of education shall receive as compensation the sum of
" five dollars per day for the time actually employed in attend-
" ing to the duties of his office, provided that the total to any
" supervisor, during any one year, shall not exceed the sum of
" twelve hundred dollars. The supervisor of education may be
" removed by the superintendent of public instruction, on the
" approval of the Governor, for incompetency, malfeasance, or
" neglect of duty. The supervisors of education shall be em-

" powered to lay off and subdivide the counties of their respect-
" ive judicial districts into school-districts, and shall be em-
" powered to appoint five school directors for each school-dis-
" trict, but the authority of the supervisors in these respects
" shall be subject to the control and revision of the superintend-
" ent of public instruction.  It shall be the duty of the super-
" visors to enforce, in their respective districts, all the rules
" and regulations adopted by the board of education for the
" government of the public free schools in this State."

By the first Section of the supplementary and amendatory
act, approved November 29, 1871, this section of the act of
April 24, 1871, was so amended as to read as follows :

" *Clause First.* The Board of Education shall, upon the pas-
" sage of this act, proceed to apportion anew the territory of
" this State into convenient educational districts, not to exceed
" twelve in number; provided that nothing in this clause shall
" be so construed as to prohibit said board hereafter from con-
" solidating or otherwise changing or altering the boundaries of
" said districts for educational purposes.

" *Clause Second.* And as soon as the educational districts
" contemplated in the foregoing clause shall be created, it shall
" be the duty of the superintendent of public instruction to
" retire or relieve each supervisor of education heretofore ap-
" pointed and commissioned as such; and the said superintend-
" ent is hereby authorized to appoint, with the approval of the
" Governor, for each newly created district, one supervisor of
" education, who shall hold his office for the term of four years
" from the date of his commission, unless sooner removed by
" said superintendent for cause, on the approval of the Gov-
" ernor; and the supervisor may act as examiner of teachers.

" *Clause Third.* And each supervisor so appointed shall re-
" ceive for his services, out of any moneys belonging to the
" available school-fund not otherwise appropriated : first, a sala-
" ry of eighteen hundred dollars per annum; second, all ex-
" penses for postage; and third, all traveling expenses neces-
" sarily incurred while employed in the actual discharge of the

" duties of his office; provided, that the amount of the above-
" mentioned expenses shall not exceed the sum of two hundred
" dollars, on voucher to be approved by the superintendent of
" public instruction, during any one scholastic year.

" *Clause Fourth.* And the supervisors herein provided for,
" shall be empowered to lay off and subdivide the counties in
" the territory under their jurisdiction into convenient school-
" districts; and they shall also appoint, on the approval of the
" superintendent of public instruction, five directors for each
" school-district; but the authority of the said supervisors in
" the management, control, and oversight of their respective
" districts, shall be subject to the control, direction, and revis-
" ion of the said superintendent, and it shall be the further
" duty of the said supervisors to enforce in their respective
" districts, all rules and regulations adopted by the Board of
" Education for the government of the public free schools in
" this State."

Returning to the original act of April 24, 1871, it is further
enacted, as follows, to wit:

" SECTION 3. The superintendent of public instruction, with
" the Governor and the attorney-general, shall form a Board of
" Education for the State. It shall be the duty of this board,
" subject to the Constitution and laws of the State, to adopt all
" necessary rules and regulations for the establishment and pro-
" motion of public schools, to provide for the examination and
" appointment of teachers, and to fix their compensation, to
" define the course of studies in the public schools, and direct
" the class and kind of apparatus and books to be used therein;
" to prescribe the duties of the boards of directors, and gener-
" ally to do all things not inconsistent with the Constitution
" and laws of this State, necessary to establish and maintain a
' system of public free schools; provided that the Board of
" Education for this State shall prescribe no rule or regulation
" that will prevent the directors of the school-districts from
" making any separation of the students that the peace and
" success of the school and the good of the whole may require.

"Section 4. The Board of Education for the State shall "report for action of the Legislature, from time to time, such "amendments of the school-laws of this State as may be found "necessary, stating in their report the facts and reasons which, "in their opinion, render necessary such proposed amendments.

"Section 5. The available school-fund liable to appropriation "for the support of public schools is hereby declared to be, all "interest which has accrued, or may hereafter accrue, to the "school-fund from railroads or otherwise, since the 30th day of "March, 1870, one-fourth of all the *ad valorem* and occupation "taxes assessed, since that date, and such other taxes as have "been or may be provided by law for the support of public "schools. Accounts against this available school-fund shall be "paid out of any part of it that may be in the treasury on ap-"propriation therefor by the Legislature. The directors of "each school-district shall have authority to levy a tax of not "exceeding one per cent., for the purpose of building school-"houses and maintaining schools in their respective school-"districts ; and the manner of the collection and disbursement "of this tax shall be prescribed by the Board of Education for "the State."

Section 6, which provides for enforcing the attendance of the scholastic inhabitants of the State on the public or other schools, we need not quote.

"Section 7. That all laws or parts of laws not consistent "with this act be and the same are hereby repealed, and that "this act take effect and be in force from and after its pas-"sage."

Is the system of public free schools, for the organization and maintenance of which this act provides, such an one as is authorized by the Constitution ?

The plain language of the Constitution compels us to say that it is not. Almost the only feature in which it can be plausibly insisted the two systems correspond, except in mere name and matters of form, is in respect to the provision in regard to the laying "off the State into convenient school-dis-

" tricts." And the law in regard to this, as we shall hereafter see, was set at naught, and totally disregarded in the organization of the school-system put in operation, and maintained by the Board of Education.

The language of the Constitution authorizing the laying off the State into convenient school-districts is not, it is true, imperative. But it is evident from the entire article of the Constitution on this subject, that such districts are the basis of the system contemplated in the Constitution. The boards of school directors of these districts, and the superintendent of public instruction are evidently intended to be the leading and essential factors in the school-system to be supported and maintained by the Legislature. That it is the duty of the Legislature to provide for laying off the State into such districts, is manifest, and has been so recognized by its action in providing for it in each of the different laws which have been enacted for the purpose of organizing a system of public free schools. But conceding that the Legislature might properly discharge its constitutional duty of providing for the support and maintenance of a system of public free schools without laying off the State into school-districts, it certainly must be admitted where this has been done, the powers which may be delegated to the boards of directors of such districts cannot be merely nominally conferred upon them but, in fact, vested in some other tribunal.

It is a legal axiom that the Legislature cannot delegate any of its powers unless authorized to do so by the Constitution. There is certainly nothing in this instrument giving the slightest countenance to the supposition that it may delegate any of its powers whatever, touching the discharge of its constitutional duty, " to make suitable provisions for the support and main-" tenance of a system of public free schools," except to the district boards " in regard to the schools, school-houses, and school-" funds of the district." Beyond such legislative powers, as to these matters, which the Legislature may deem necessary and proper to confide to these boards, its powers touching the subject can only be exercised directly by it.

That ample means might be at the command of the Legislature for the performance of the duty of providing for the gratuitous instruction of all the scholastic inhabitants of the State, a most magnificent public school fund was provided as a permanent endowment. The principal of which, from time to time, as found necessary, is to be invested in the bonds of the United States, while the interest on the fund, and the income derived from taxation for school-puposes—that is, one-fourth of the annual revenue received from general taxation, and the poll-tax of one dollar upon all male persons in the State between the ages of twenty-one and sixty—shall be annually appropriated for school-purposes, to be equally distributed among the scholastic population of the State. By means of this annual appropriation and equal distribution it was evidently intended there should accrue a "school-fund of the district," in regard to which the Legislature might give the district boards legislative powers. The annual appropriation and distribution of the amount accruing from these sources may not however constitute the entire school-fund of the district, for the Legislature may, in addition to the amount to be so distributed, "pro-" vide for the raising of such amount by taxation, in the several "school-districts in the State, as will be necessary to provide "the necessary school-houses in each district, and insure the edu-" cation of all the scholastic inhabitants of the several districts." The amount so collected in each district, whether by a general and uniform levy and rate laid by the Legislature, or by a special assessment or levy, whichever it may be most appropriately termed, by the district boards, as *quasi* corporations, as may be provided by the Legislature, must also form a part of the fund of the district in which it is collected.

We may, however, as well here say, that in our opinion, it was the purpose of this section of the Constitution to make provision to meet such deficiency as might be found to exist in the fund in each district, to be annually distributed among the districts in proportion to the scholastic population of the State. This must necessarily be a matter of local information. An

amount ample in one district would be altogether deficient in another.   If the Legislature should require the same per cent. upon the taxable property in all the districts, it would impose an unnecessary burthen in some of them, while in others, it would not meet the necessity of the case.   Nor could it possibly fix the amount needed in each district; therefore it is said in the Constitution, that the Legislature may *provide* for the raising of such amounts by taxation in the several school-districts " in the State as will be necessary."

In view of the purpose of this tax, we think this language sufficiently broad to warrant the conclusion, that the Legislature may provide for raising the necessary amount by the delegation of authority to the board of directors of the districts to levy the tax for this purpose.  At least, it cannot be maintained, when the Legislature has levied the tax by fixing its maximum rate, that it may not delegate authority to the district boards of school directors, as *quasi* corporations, to fix the amount to be collected in their district under such levy by the Legislature. The amount to be provided for, being so raised by taxation, when collected becomes, as we have said, a part of the school-fund of the district, and the fixing of the amount to be collected, we think, may be appropriately regarded as the exercise of legislative powers in regard to the school-fund of the district.

The school-system established by the law either directly or indirectly takes from the board of directors of the district, and the superintendent of public instruction, the official functions and duties which, in the system contemplated in the Constitution, are to be discharged by them, and confers them upon a board of education, created by this law ; or, in respect to such of the duties of the superintendent as are not conferred upon the Board of Education, he is subject in their exercise to the dominant power and control of the Governor.

By the Constitution, the superintendent shall have the supervision of public free schools, and perform such other duties concerning public instruction as the Legislature may direct.   It

is made his duty to recommend to the Legislature such provisions of law as may be found necessary, in the progress of time, to the establishment and perfection of a complete system of education. At each session of the Legislature it is also his duty to furnish the Legislature with a complete report of all the free schools in the State, giving an account of their condition and the progress of education.

The law says the Board of Education shall report to the Legislature such amendments of the school-laws as may be found necessary, with the facts and reasons which in their opinion render them necessary. It is also made the duty of this board to adopt all necessary rules and regulations for the establishment and promotion of public schools; to provide for the examination of teachers, and to fix their compensation; to define the course of studies in the schools, and direct the class and kind of apparatus and books to be used.

And in addition to this plain transfer of the constitutional functions of the superintendent of public instruction to the Board of Education, and the delegation of legislative power to said board, in regard to schools and school-houses—for conferring of which by the Legislature upon any other officers than the board of school directors for each school-district, there is no color of authority in the Constitution—the Board of Education is also given legislative authority to prescribe the manner of collecting and disbursing the tax of one per cent., which the directors of each school-district are nominally authorized to levy for the purpose of buiding school-houses, and maintaining schools in their respective school-districts.

That the authority to levy this tax is intended only to be nominally conferred upon the directors of the school-districts, is obvious, when it is considered that though the Constitution says that the Legislature may lay off the State into convenient school-districts, which is plainly a duty calling for the exercise of legislative power, which cannot be parted with by that body, or deputed to any other—though it may use subordinate instrumentalities to carry into effect such discretion,

when exercised, yet to intrust it to the executive department would be as obviously unconstitutional as it would be for the Legislature to authorize the Governor to divide the State into appropriate judicial districts. Yet the law says the Board of Education shall apportion the territory of the State into educational districts; and for each of these districts, the superintendent of public instruction shall appoint, with the approval of the Governor, a supervisor of education, who may be removed at any time by the superintendent for cause, without specification of its nature or character, on the like approval of the Governor. And the supervisor thus appointed, and holding his office, in effect, at the will and pleasure of the superintendent and the Governor, is impowered to lay off and subdivide the counties in the territory under his jurisdiction into convenient school-districts, and to appoint, on the approval of the superintendent, five directors for each school-district. The authority, however, of the supervisors in the management, control, and oversight of their respective districts, is subject to the control, direction, and revision of the superintendent. And lest there might be some reason still to fear that these district boards, holding their offices at, it would appear, the mere will of the appointing power, might not be sufficiently subservient to the Board of Education, it is made the duty of the supervisors to enforce in their respective districts all rules and regulations adopted by said board for the government of the public free schools in the State.

That it may the more clearly appear that the tax in question in these cases, and which we have said the directors of the school-districts were only nominally authorized to levy, was in fact levied by the Board of Education, without constitutional authority, and contrary to the letter of the law, but in conformity to its real spirit and import, and that the extent and general scope of the legislative powers claimed and exercised under this law by the Board of Education may be at least partially perceived, we will here insert an extract or two from the " rules and regulations for the government of public free

" schools," adopted by the board, and from " circulars " issued by it.

" Rule 7. Boards of directors of school-districts shall levy a " tax of one per cent., as provided by Section 5 of 'an Act to " ' organize and maintain a system of public free schools in the " ' State of Texas,' approved April 24, 1871; said levy to be " made on the assessment-rolls of the tax-assessors of their " respective districts, and collected and deposited as provided " in rule No. 9.

" Rule 8. In counties where assessors have already levied " the tax of one-eighth of one per cent. as prescribed by Sec-" tion 8 of ' an Act to give effect to the several provisions of " ' the Constitution concerning taxes,' approved April 22, 1871, " school directors will levy a tax of seven-eighths of one per " cent., under Section 5 of ' an Act to organize and maintain " ' a system of public free schools in the State of Texas,' ap-" proved April 24, 1871, so that the whole tax levied for school " purposes shall be one per cent.   One-fourth of the tax levied " by school directors to be collected on or before September 1, " 1871, and the balance in three equal amounts, within three, " six, and nine months from September 1, 1871.

" *Rule* 9. The tax levied by the school directors of each " school-district of the different counties shall be collected by " the sheriff of each county, and by him deposited with the " treasurer of the board of directors, subject to the order of " the school directors in whose school-district the money may " be collected, on approval of said order by the superintendent, " and said money shall not be paid out by any treasurer except " in accordance with the rules and regulations of the State " Board of Education.   But, should any person refuse or fail " to pay the school-tax, the sheriff will proceed to enforce the " collection of the same, in the manner provided by Sections " 19, 20, 21, and 22, of ' An Act to give effect to the several " ' provisions of the Constitution concerning Taxes,' approved " April 22, 1871, except so much thereof as directs the return " of a delinquent-list to be made to the comptroller of public

" accounts. The delinquent-lists, instead of being returned to
" the comptroller, shall be forwarded to the superintendent of
" public instruction. Where the law is not specific, sheriffs
" will be governed by the instructions issued by the comp-
" troller of the State of Texas in regard to the collection of the
" taxes of the State, issued in conformity with said act. In
" case it may be necessary to bring suit for the collection of
" taxes, such suit shall be brought in the name of the State of
" Texas, for the use of the board of school directors of the
" district where such tax is due, and shall, when collected, be
" paid to the treasurer of said board. The fees to be allowed
" the officers for their services shall be the same as those allowed
" for similar services in collecting the taxes of the State."

" *Rule* 23. School directors will establish their own rules
" with reference to the time and place of their meeting, also
" the transaction of their general business, subject, however, to
" the approval of the supervisors of their respective districts."
(See Rules and Regulations, etc., revised December, 1871, 20,
21, and 24.)

" II. Should any board of directors fail or refuse to levy the
" tax as prescribed by Rule 26, Title 4, ' Rules for the gov-
" 'ernment of Public Schools,' and Rule 17, Title 3, ' Boards
" ' of Directors,' the fact will be reported to this office."    (See
Circular of Superintendent of Public Instruction, August 21,
1871.)

The rules cited in the circular are substantially the same as
those which we have just quoted, though differently arranged
and numbered in their subsequent revision :

" I. Sheriffs are hereby directed to turn over monthly, to the
" treasurers of the boards of directors of their respective
" counties, moneys collected by them of the one per cent. levy
" made by school directors of their counties, and report to the
" superintendent of public instruction the amount so collected
" and transferred.

" II. Treasurers of the boards of school directors will make
" to the office of the superintendent of public instruction

"monthly reports of moneys received by them from the sher-
"iffs of their respective counties, and the amount expended
"by them." (Circular, Board of Education, September 11,
1871.)

"Information having been received at this office that District
"Judges have enjoined the collection of the school-tax in some
"individual cases, and that some sheriffs have taken such in-
"junction as an excuse from attempts to collect the tax from
"other persons liable to pay it, it has therefore been found
"necessary to say that sheriffs will continue to collect the
"school-tax in accordance with the rules and regulations
"adopted by the Board of Education of the State of Texas, or
"subject themselves to the penalty of the law."

"When a District Judge grants an injunction in any partic-
"ular case, the sheriff of the county and district attorney of
"the district must at once appeal from such interlocutory judg-
"ment, as authorized by the act approved November 1, 1871,
"and, in the mean time, the sheriff must proceed to collect the
"tax from all other persons, requiring each individual to pay
"his tax, or to take out a separate writ of injunction." (Cir-
cular, Board of Education, December 11, 1871.)

Other extracts from the "Rules and Regulations," the
"Circulars," and "Instructions," emanating from this board,
might be given, showing the extent of the executive and ju-
dicial powers claimed and exercised by it, in the organization
and maintenance of the school-system authorized by this law,
in regard not only to "schools, school-houses, and the school-
"fund," but also as to all matters in any way connected with
such school-system. It is, however, unnecessary to do so.
When it is remembered that this board was authorized and
actually did impose upon the people of the State a much heavier
burthen as a school-tax than has ever been levied by the Legis-
lature for general purposes of revenue, and that this tax,
amounting, in the aggregate, to certainly over two millions of
dollars, was to be collected, and, together with the interest
from the permanent school-fund, the one-fourth of the annual

revenue derivable from general taxation, and the poll-tax, was to be disbursed as it might provide; that there was conferred by this law directly and indirectly upon the board an official patronage with an extent of following far greater than that of the entire executive department of the State; that the salaries of many of the subordinate officers, as well as the tenure of office as to nearly all of them, was dependent on its will and pleasure—it cannot be imagined that such immense and unprecedented powers, without check or responsibility of any kind could, with due regard to the public interest, have been intrusted to any three individuals for any length of time. It is, indeed, hardly possible to conceive that authority to do this would have been sanctioned, in the organization of the government, by a people jealous of their rights and deeply impressed with traditional antipathy against irresponsible power.

The authority conferred upon the Board of Education by this law, and the collection of the tax in question in these cases, cannot be sanctioned or justified unless there can be shown a plain and unequivocal warrant in the Constitution for the granting of these powers to the Board of Education; but which has not been and evidently cannot be done.

Aside from the want of constitutional authority to confer upon the Board of Education the powers given in this law, we are of opinion that neither the Governor nor the attorney-general could, consistently with the limitations and restrictions in the Constitution, become members of said board, or discharge the duties pertaining thereto. We do not question that duties not inconsistent with their constitutional functions may be superadded to the duties of these offices. But it is quite obvious that the Legislature cannot, under color of enlarging the duties of a constitutional officer, confer upon him the functions and powers of another and altogether different office. The duties of the Board of Education, aside from those which are of a legislative character, to which we have referred, are almost if not entirely such as properly and exclusively belong to the superintendent of public instruction. They seem to us

scarcely consistent with the constitutional functions of the Governor, and certainly are not with those of the attorney-general.

The answer given to this objection to the law, in the former decisions of the court which we have cited, seems to be mainly, that the members of the Board of Education do not, as such, exercise the functions, or discharge the duties of an office, or if so, that it is only such offices, agencies, or appointments as have salaries, emoluments or perquisites attached to them, to which the constitutional inhibition against holding two offices at the same time attaches.

We are not prepared to concede the correctness of either branch of this proposition. The language of the Constitution is, that the attorney-general, and certain other enumerated officers, shall not at the same time hold or exercise any two offices, agencies, or appointments of trust or profit, unless one of them should be one of those specially mentioned in the Constitution. And the Governor is prohibited, without any qualification or exception whatever, from holding any other office or commission, civil or military. Can it be supposed for a moment that the Governor could hold the office of a clerk of one of the courts, or the attorney-general that of secretary of the Senate, because they were willing to discharge the duties of these offices gratuitously?

The comments heretofore made as to the powers conferred upon the Board of Education obviate the necessity of our doing so for the purpose of showing that its members exercise and discharge the functions and duties of an office, agency, or appointment. Certainly, we think it cannot be denied, that those who are charged with the administration of a general law of the great public importance of this act for the organization and maintenance of a system of public free schools, and whose appointees and subordinates are officers by the very terms of the law, with good salaries and of no mean grade, must be regarded as exercising and discharging the powers and duties of an office, although there is neither salary nor perquisites attached thereto.

These are not the only constitutional provisions violated by delegating to the Governor, attorney-general and superintendent, the functions intrusted to them as a Board of Education by this law : to lay off the State into convenient school-districts; to levy taxes so as to raise in the several school-districts an amount in addition to that derived from the public school fund ; to prescribe the manner of collecting and disbursing the money raised by this law ; to frame all necessary rules and regulations for the establishment and promotion of public schools; to prescribe the qualifications of the great bulk of the employees or officers necessary to establish and maintain said system, define their duties and fix their compensation, all which this Board is authorized to do directly or indirectly through subordinates appointed by and and holding their offices at its pleasure, unquestionably require and could only be effected by the exercise of legislative powers.  And though it should be conceded that the Legislature was not absolutely required to effect these objects by its immediate and direct action, but might do so by appropriate instrumentalities, to whom it might delegate the necessary authority to this end, still it is most obvious, whether these objects are attained by the direct or indirect action of the Legislature, that they are effected by the exercise of power properly belonging to the legislative department, which cannot be delegated to or exercised by one person or collection of persons belonging to the executive department, unless there was an express warrant for it in the Constitution.  Certainly it cannot be insisted that there is any color of such authority as regards either the Governor or attorney-general.

But if the law was in all respects unobjectionable, and the levy of the tax complained of was, in fact, the act of the directors of the several school-districts by whom it purports to have been levied, instead of that of the Board of Education, as in reality, we think, it is; still, in our opinion, the conclusion is inevitable, that it was not levied by the directors of such school-districts as are required by the law, and to whom the discre-

tionary power of requiring the collection of a tax of not less than one per cent. in their respective school-districts is conferred by the act under which it is claimed the tax in question has been rightfully levied.

Granting that it is not an imperative duty of the Legislature to lay off the State into convenient school-districts, or granting, also, if desiring it to be thus laid off, that it may do so by means of the Board of Education, or supervisors appointed by it, unquestionably when the Legislature indicates its purpose that the State shall be laid off in a particular manner, and has directed those to whom it has intrusted this duty, to do it in the particular and prescribed manner, such agents cannot disregard the directions of the Legislature, and substitute in lieu thereof districts laid off in accordance with their own judgment and discretion. If this is attempted to be done, the act of the officer or agent to whom this duty has been intrusted is without authority. If the school-district laid off by him is not such a district as authorized by the law, the board of directors of such district cannot certainly exercise the legislative function of levying a tax, delegated to the directors of such districts as in the judgment of the Legislature could with propriety be intrusted with this power.

The law in plain and unmistakable language empowers the supervisors of education " To lay off and *subdivide the coun-* " *ties* in their territory into convenient school-districts." It is the directors of these convenient districts into which the counties have been subdivided to whom the authority is given to levy this tax and have it collected. That the supervisors of education ever laid off and subdivided the counties in their territory into school-districts is not pretended. It is a fact apparent from the records before us as well as a matter of general notoriety, that the officers intrusted with this duty, in disregard of the plain language of the statute, either divided their territory by laying off each county into a school-district, or simply adopted this division as made by the School-Law of 1870, notwithstanding the fact of its having been super-

seded by that of 1871, under which the tax in question is claimed.

In the case of Kinney v. Zimpleman, no notice seems to have been taken by the court of this objection. While in the cases of The State v. Bremond, and Hall v. H. & T. C. R. W. Co., after referring to the provisions of the acts of August 13, 1870, April 24, 1871, and November 29, 1871, bearing upon the point, it is summarily disposed of by the court, in the first case, by the sweeping declaration, that " We are unable to find " wherein these provisions of the law have been violated in a " manner to render the collection of the tax illegal." And in the latter one, as follows : " Under this legislation, it does not " become material for us to inquire whether the counties were " subdivided into districts or not; and the error of the court in " instructing the jury that the county must have been divided " into sub-districts is apparent."

We are constrained to say that we cannot concur in the opinion of the court, nor are the grounds upon which its conclusion is founded by any means apparent to us. The most reasonable inference which occurs to our minds as inducing their conclusion, is, that the court either supposed that each organized county of the State was a school-district by reason of the law of August 13, 1870, and so continued until their territory should be otherwise divided by the supervisors, under the authority conferred upon them by the act of April 24, 1871 ; or, since, under the law of August 13, 1870, it was matter of discretion with the County Court, who were ex officio boards of school directors for their respective counties, whether or not their counties should be divided into sub-districts, it was to be inferred that it was also a matter of discretion with the supervisors of education under the law of April 24, 1871, whether the counties in their territory should be subdivided into different districts.

To the first of these suggestions, we respond that it was the evident purpose of the Legislature, by the adoption of the act of April 24, 1871, to supersede the school-system contemplated

in the act of August 13, 1870. The provisions of the two acts, in regard to the matter of laying off the State into convenient school-districts, are in direct and manifest conflict. Those contained in the first of these laws are abrogated and annulled by the second.

The legislative sense in respect to the proper division of the State into convenient school-districts is expressed in the act of August 13, 1870, by declaring each organized county a school-district, with the delegation of power, lest such districts might be inconvenient by reason of their size, to the boards of directors of their respective counties, to subdivide them if found necessary for public convenience. The provisions of the law of 1871, upon the subject, are altogether different. Time and experience seems to have satisfied the legislative mind that the constitutional requirement for laying off the State into convenient districts was not complied with by making each organized county a school-district, with a discretionary power in the boards of directors for their subdivision. Hence, in the act of 1871, while no districts are directly laid off, the duty of doing this is committed to the supervisors of education, with the emphatic declaration that they " shall be empowered to lay " off and subdivide the counties of their territory into conven- "ient school-districts." Aside from the authority given in this clause, there is nothing in the law creating or laying off any school-district whatever, or to authorize its being done. Looking to the law, we think it cannot be questioned that it clearly appears to have been the intention of the Legislature, that the convenient districts into which the State was to be divided, should be subdivisions of the counties. And any division of it into districts otherwise laid off is without authority.

The fact that the directors of the districts, as laid off by the Legislature in the former law, were given the discretionary power to subdivide their districts, affords no reason for supposing that an unlimited discretion was given to the supervisors, in the subsequent law superseding it, to lay off the counties in the territory into school-districts, contrary to the plain language

of the act under which they derive their authority in the matter.

The court being of the opinion, for the reasons stated, that the tax in controversy in these cases has not been levied in manner prescribed, or under authority of law, and that the same is an illegal and wrongful charge against those persons from whom it is demanded, it is ordered and adjudged that the judgment in each of the following of the said above-entitled cases, to wit, J. P. Willis & Brother v. Joseph A. Owen, sheriff, et al., No. 123, appeal from Galveston; M. Kennedy v. John McClane, sheriff, No. 231, appeal from Nueces; M. Kennedy et al. v. William Scanlin, sheriff, No. 232, appeal from Cameron; T. H. Clark et al. v. John McClane, sheriff, No. 249, appeal from Nueces, be and the same is hereby reversed. And it is further ordered and adjudged that judgment be here rendered by this court in each of said cases in favor of said appellants; and that the appellees be and they are hereby perpetually enjoined and restrained from collecting of and from said appellants said tax levied by said boards of directors in their respective school-districts, as prayed for in their several petitions. And it is further ordered and adjudged that the judgment in the cases of A. W. & E. P. Clegg v. The State of Texas, No. 287, appeal from Galveston; Edward T. Austin v. The State of Texas, No. 338, appeal from Galveston; and Galveston, Harrisburg, and San Antonio Railway Company v. The State of Texas, No. 421, error from Harris, be reversed, and said causes be dismissed.

(Justice Reeves did not sit in this case.)