# IN THE SUPREME COURT OF TEXAS

No. 21-0667

IN RE GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF TEXAS; MATTHEW MCDADE PHELAN, IN HIS OFFICIAL CAPACITY AS SPEAKER OF THE TEXAS HOUSE OF REPRESENTATIVES; AND THE STATE OF TEXAS, RELATORS

ON PETITION FOR WRIT OF MANDAMUS

JUSTICE BLACKLOCK delivered the opinion of the Court.

> Two-thirds of each House shall constitute a quorum to do business, but a smaller number may adjourn from day to day, and compel the attendance of absent members, in such manner and under such penalties as each House may provide.

TEX. CONST. art. III, § 10.

Plaintiffs in the underlying suit[1] are members of the Texas House of Representatives who denied the House a quorum by fleeing the state on July 12, 2021. They broke quorum to prevent the legislature, in special session, from enacting voting legislation they oppose. They fled the state to escape the jurisdiction of the House, whose internal rules provide that absent members may be "arrested" and their attendance "secured and retained." Tex. H.R. 4, Rule 5, § 8, 87th Leg., R.S., H.J. of Tex. 47, 93, *reprinted in Rules of the House*, TEXAS LEGISLATIVE MANUAL 87 (2021). On August 8, twenty-seven days after leaving the state and twenty-six days after the House first voted

---

[1] The Plaintiffs are Representatives Gina Hinojosa, Alma A. Allen, Michelle Beckley, Jasmin Crockett, Joe Deshotel, Barbara Gervin-Hawkins, Vikki Goodwin, Celia Israel, Ray Lopez, Armando "Mando" Martinez, Trey Martinez Fischer, Ina Minjarez, Christina Morales, Mary Ann Perez, Ana-Maria Ramos, Richard Peña Raymond, Ron Reynolds, Eddie Rodriguez, and Ramon Romero, Jr.

to invoke House Rule 5 to compel their attendance, Plaintiffs sued the Governor and the Speaker of the House in Travis County district court, seeking an injunction prohibiting their arrest.[2]

Without soliciting a response from the defendants or conducting an adversarial hearing, the district court on August 8 granted an *ex parte* temporary restraining order ("TRO") prohibiting the defendants from compelling the plaintiffs' attendance by arrest or other confinement or restraint for the next fourteen days.[3] One day later, the defendants, relators in this mandamus action, sought emergency relief in this Court. They seek a writ of mandamus directing the district court to withdraw the TRO. After Plaintiffs responded to the relators' emergency motion, we stayed the TRO. Plaintiffs responded to the mandamus petition on August 16.

The question now before this Court is not whether it is a good idea for the Texas House of Representatives to arrest absent members to compel a quorum. Nor is the question whether the

---

[2] Plaintiffs also sued the State of Texas, but in their response to the mandamus petition in this Court, they abandoned their claims against the State.

[3] The TRO restrains the defendants from:

a. Detaining, confining, or otherwise restricting a Texas House Democrat's movement without his or her consent so as to interfere substantially with his or her liberty within the State of Texas under the alleged authority of Article III, Section 10 of the Texas Constitution, House Rule 5, Section 8, or a Call to the House passed on or after July 13, 2021;

b. Issuing any warrants or other instruments commanding the detention, confinement, or other restriction of a Texas House Democrat's movement without his or her consent so as to interfere substantially with his or her liberty within the State of Texas under the alleged authority of Article III, Section 10 of the Texas Constitution, House Rule 5, Section 8, or a Call to the House passed on or after July 13, 2021; and

c. Commanding the Texas House sergeant-at-arms, officers appointed by the Texas House sergeant-at-arms, Department of Public Safety, Texas Rangers, Texas Highway Patrol Officers, Capitol Police Officers, or other law enforcement officials to detain, confine, or otherwise restrict a Texas House Representative's movement without his or her consent so as to interfere substantially with his or her liberty within the State of Texas under the alleged authority of Article III, Section 10 of the Texas Constitution, House Rule 5, Section 8, or a Call to the House passed on or after July 13, 2021.

proposed voting legislation giving rise to this dispute is desirable. Those are political questions far outside the scope of the judicial function. The legal question before this Court concerns only whether the Texas Constitution gives the House of Representatives the authority to physically compel the attendance of absent members. We conclude that it does, and we therefore direct the district court to withdraw the TRO.

"[I]f the record establishes that an applicant cannot show a probable right to the relief sought, then the applicant is not entitled to a temporary restraining order." *In re Turner*, 558 S.W.3d 796, 799 (Tex. App.—Houston [14th Dist.] 2018, orig. proceeding). The district court concluded that Plaintiffs cleared this hurdle. It premised its TRO, in part, on the following legal conclusion:

> The Court finds that it clearly appears from the facts set forth in Plaintiffs' Original Petition and the affidavits and evidence attached thereto that Defendants have erroneously interpreted Texas law and legislative rules to permit the detention, confinement, or other restriction of members of the Texas House of Representatives within the State of Texas in response to a call for a quorum . . . .

TRO at ¶1.

We disagree. After examining the text and history of article III, section 10, together with the relevant judicial precedent, we conclude that the disputed provision means just what it says. The Texas Constitution empowers the House to "compel the attendance of absent members" and authorizes the House to do so "in such manner and under such penalties as [the] House may provide." The text of article III, section 10 is clear, and the uniform understanding of the provision throughout our state's history—including around the time of its enactment—has been that it confers on the legislature the power to physically compel the attendance of absent members to achieve a quorum. Plaintiffs proffer a novel understanding of article III, section 10 under which

3

the House's power to "compel the attendance of absent members" authorizes only persuasion and dialogue, rather than true compulsion. That is simply not what the constitution says. Adopting Plaintiffs' view of article III, section 10 would restructure the Texas Constitution's careful balance between the right of a legislative minority to resist legislation and the prerogative of the majority to conduct business. This we cannot do. Article III, section 10 is one of the foundational constitutional rules governing the law-making process in Texas. Neither the passage of time nor the passions of a hotly contested legislative dispute can change what it means.

As explained below, the record conclusively establishes that Plaintiffs lack a "probable right to the relief sought." *In re Turner*, 558 S.W.3d at 799. As a result, the district court abused its discretion by granting the TRO, which we now direct that court to dissolve.

**I.**

**A.**

Article III, section 10 provides that two-thirds of the members of a legislative chamber "constitute a quorum to do business." TEX. CONST. art. III, § 10. It also authorizes "a smaller number"—less than two-thirds—to "compel the attendance of absent members, in such manner and under such penalties as each House may provide." Thus, in addition to setting the now-well-known quorum requirement at two-thirds, the constitution in its next breath gives the present members of each chamber a remedy against the absent members when a quorum is lacking. They may "compel the attendance of absent members" in order to achieve a quorum so that business may be done. Just as article III, section 10 enables "quorum-breaking" by a minority faction of the legislature, it likewise authorizes "quorum-forcing" by the remaining members.

Article III, section 10 imposes no restrictions on the means by which compulsion of the attendance of absent members may be achieved. Instead, it commits that question to the discretion of the chamber by authorizing the present members to "compel the attendance of absent members, *in such manner and under such penalties as each House may provide*." The Texas House of Representatives has established the "manner" and "penalties" under which it will exercise its constitutional authority to compel the attendance of absent members by instituting House Rule 5, section 8. This internal House rule authorizes the physical "arrest" of absent members in order to compel their attendance: "All absentees for whom no sufficient excuse is made may, by order of a majority of those present, be sent for and arrested, wherever they may be found, by the sergeant-at-arms or an officer appointed by the sergeant-at-arms for that purpose, and their attendance shall be secured and retained." Tex. H.R. 4, Rule 5, § 8, 87th Leg., R.S., H.J. of Tex. 47, 93, *reprinted in Rules of the House*, TEXAS LEGISLATIVE MANUAL 87 (2021).

Although this Court has never had occasion to address the matter, the prevailing historical understanding in Texas has been that physical restraint of absent members of the legislature to "compel the[ir] attendance" is a valid exercise of the quorum-forcing authority granted to each chamber by article III, section 10. Since the middle of the nineteenth century—around the time of article III, section 10's adoption at the advent of statehood in 1845—the rules of both chambers have provided for the physical compulsion of absent members to secure a quorum. *See, e.g.*, Tex. H.R. Rule 56, 6th Leg., R.S., H.J. of Tex. 17, 26 (1855) (providing absent members "may be sent for and taken into custody wherever to be found, by special messengers appointed for that purpose" upon a call of the House); Tex. S.R. Rule 2, 1st Leg., R.S., S.J. of Tex. 25, 26 (1846) (stating "a

5

majority of [Senators] shall be authorized to send the Sergeant at Arms, or a special messenger, for the absentees" if "less than a quorum [is] present").[4]

Our goal when interpreting the Texas Constitution is to give effect to the plain meaning of the text as it was understood by those who ratified it. *Sears v. Bayoud*, 786 S.W.2d 248, 251 (Tex. 1990); *Degan v. Bd. of Trustees of Dallas Police & Fire Pension Sys.*, 594 S.W.3d 309, 313 (Tex. 2020). Thus, "[l]egislative construction and contemporaneous exposition of a constitutional provision is of substantial value in constitutional interpretation." *Am. Indem. Co. v. City of Austin*, 246 S.W. 1019, 1023 (Tex. 1922). Article III, section 10 dates in its current form to 1845. *See* TEX. CONST. OF 1845, art. III, § 12.[5] The legislature's mid-nineteenth century view that article III, section 10 authorized it to take absent members "into custody" is therefore particularly compelling evidence of the original understanding of the provision. As has been the case before, "[t]he questions to be considered in these cases . . . . involve the construction and interpretation of the organic law, and present for consideration the structure of the government." *Willis v. Owen*, 43 Tex. 41, 49 (1875). In such cases, even if the meaning of the constitutional text were doubtful (here, it is not), "a long-settled and well-recognized judicial interpretation, *or even legislative or*

---

[4] Functionally similar internal chamber policies authorizing the physical compulsion of absent members persist to the modern day in both chambers, and in the case of the House, give rise to the present dispute. *See* Tex. H.R. Rule 8, § 13(f), 87th Leg., R.S., H.J. of Tex. 49, 126, *reprinted in* TEXAS LEGISLATIVE MANUAL 87 (2021); Tex. S.R. 2, Rule 5.04, 87th Leg., R.S., S.J. of Tex. 15, 31, *reprinted in* TEMPORARY SENATE RULES (2021).

[5] The 1836 Constitution of the Republic of Texas contained a similar provision: "Two thirds of each House shall constitute a quorum to do business, but a smaller number may adjourn from day to day, and may compel the attendance of absent members." REPUB. TEX. CONST. OF 1836, art. I, § 13. If anything, the 1845 Constitution expanded the legislature's quorum-forcing power relative to the era of the Republic by clarifying that compulsion of attendance could be achieved "in such manner and under such penalties as each House may provide."

6

*executive construction within the sphere of their respective functions*, might be sufficient to turn the balanced scale."[6] *Id.* (emphasis added).

The view that article III, section 10 gives the legislature the power to physically compel members' attendance is no mere artifact of history. Well-known modern commentaries on the Texas Constitution reinforce this longstanding interpretation. "The usual manner to secure a quorum when members absent themselves so as to prevent a quorum is to arrest the absentees and force them to attend the sessions of the house of which they are members." TEX. CONST. art. III, § 10 interp. commentary (Vernon 2007). "[S]ecur[ing] a quorum . . . usually takes the form of sending out the sergeant-at-arms to bring in absent members, and the house rules make clear that he may arrest them for this purpose." GEORGE D. BRADEN ET AL., THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 117 (1977).[7] A further demonstration of the prevailing understanding of article III, section 10 is Plaintiffs' own behavior. They assumed, as did previous generations of quorum-breaking legislators, that a successful break of quorum required their absence from the state because they were subject to arrest and compelled attendance if they remained within Texas.

That assumption was not mere speculation. The historical understanding of article III, section 10 flows naturally from the provision's uncomplicated text, which authorizes the present

---

[6] As the U.S. Supreme Court put it, "the construction and effect of the constitutional provision here in question are confirmed by the practical construction that has been given to it by the [other branches] through a long course of years. . . . Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character." *The Pocket Veto Case*, 279 U.S. 655, 688–89 (1929).

[7] These secondary sources are obviously not binding authority, but they serve to demonstrate the prevailing understanding that physical compulsion of absent members is a valid exercise of the House's quorum-forcing authority.

members to "compel the attendance of absent members" in the manner of the chamber's choosing. Plaintiffs do not explain—and we are unable to imagine—how the present members could truly *compel* the attendance of absent members without the power to physically restrain them. Plaintiffs suggest the House can compel a quorum by "making insistent requests and engaging in meaningful debate." Such "compulsive discourse," as they put it, is allowed, but "forcible arrest" is not. The constitution, however, does not authorize suggestion, persuasion, or even coercion to achieve a quorum. It authorizes *compulsion* of *attendance*. Attendance in the House chamber is a physical state of being. We are aware of no method of compelling an unwilling person to be physically in attendance at a particular place without the power of physical restraint. Although arrest of absent members may seem an extreme step to some observers, the fact remains that if the absent members are sufficiently motivated to resist, the quorum-forcing authority given by the constitution to the present members can only be effectuated by physical compulsion. Article III, section 10 has long been understood to contemplate the possibility that it may become necessary to use physical compulsion to force a quorum, and the provision's text fully supports that understanding.

In addition to vesting each chamber with the power to "compel the attendance of absent members," the constitutional text gives each chamber the authority to achieve this compulsion "*in such manner and under such penalties as each House may provide*." Article III, section 10 thereby leaves it to each chamber to decide for itself the "manner" by which it will compel attendance and the "penalties" it will impose in so doing. Thus, even if arrest were only one of many potential ways of compelling a quorum, the decision whether to employ arrest—or any other potential

8

method of compelling attendance—is textually committed to the discretion of each legislative chamber, not to the courts.[8]

## B.

Even if the text and history of article III, section 10 were not determinative, the available judicial precedent is also at odds with Plaintiffs' position.[9] The United States Supreme Court long ago addressed the meaning of the federal constitution's textually indistinguishable quorum-forcing clause. *See Kilbourn v. Thompson*, 103 U.S. 168, 190 (1880). Under the federal constitution's quorum provision, "a Majority of each [House of Congress] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may

---

[8] Pointing to this textual commitment of the question to the legislative branch, Relators contend that this dispute raises political questions improper for judicial resolution. When the constitution commits a particular decision to the discretion of a coordinate branch of government, judicial second-guessing of the decision raises grave separation-of-powers concerns. For this reason, "[t]o protect the separation of powers essential to the structure and function of American governments, . . . the Judicial Branch will abstain from matters committed by constitution and law to the Executive and Legislative Branches." *Am. K-9 Detection Servs. LLC v. Freeman*, 556 S.W.3d 246, 249 (Tex. 2018). Relators contend the courts lack jurisdiction over this dispute under political-question principles, because of sovereign immunity, and under other theories. We need not resolve those questions, however, when other ample, independent grounds exist for granting mandamus relief directing dissolution of the TRO. Of course, we would normally resolve jurisdictional questions first. *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 499 (Tex. 2015). Here, however, we are asked to direct the dissolution of an order that is alleged to be defective under several independent theories, only some of which are jurisdictional. As we have held previously, when "[t]he failure of either showing"—either jurisdiction or the merits—"means a probable right to relief is lacking . . . . we need not consider at th[is] stage whether the plaintiffs have [established jurisdiction]." *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 917 (Tex. 2020) (per curiam). *Cf. Tex. Alliance for Retired Ams. v. Hughs*, 976 F.3d 564, 567–68 (5th Cir. 2020) ("The Secretary's arguments as to standing [and] sovereign immunity . . . are harder to decide on our necessarily expedited review, but we need not reach them because the Secretary has made a strong showing that she is likely to succeed on the merits . . . .").

[9] Plaintiffs contend that the precedent is mixed. They point to an overturned injunction against arrest granted by a district court to a quorum-breaking Texas House member in 2004. *Davis v. Burnham*, 137 S.W.3d 325 (Tex. App.—Austin 2004, no pet.). The court of appeals reversed that injunction. It did so, in part, because the discussion at the district court hearing of the legality of the threatened arrest had been so cursory that the court of appeals could not "reasonably conclude that either party intended to try the merits of this issue at that hearing." *Id*. at 335. The case provides no support for Plaintiffs' position.

9

provide." U.S. CONST. art. I, § 5, cl.1.[10]  While Congress's quorum rule is one-half instead of two-thirds, Congress's quorum-forcing power closely mirrors the Texas Legislature's.  In *Kilbourn*, the U.S. Supreme Court interpreted the federal constitution's quorum-forcing language to vest expansive power in Congress to determine the "Manner" by which to compel "the Attendance of absent Members."  In the Court's words, "the penalty which each House is authorized to inflict in order to compel attendance of absent members may be imprisonment."  *Kilbourn*, 103 U.S. at 190.  Relators contend that if "imprisonment" is a valid exercise of Congress's quorum-forcing power under functionally identical constitutional text, then surely the "arrest" and "restraint" provided by the Texas House Rules are valid as well.

As a federal decision, *Kilbourn* is not binding precedent on the meaning of the Texas Constitution.  For two reasons, however, it is highly persuasive authority on the scope of the Texas Legislature's article III, section 10 quorum-forcing power.  First, it is a decision of the U.S. Supreme Court on a textually indistinguishable provision of the federal constitution.  We frequently look to federal constitutional decisions when interpreting analogous state constitutional provisions, particularly when the constitutional text is functionally identical.  *See, e.g.*, *Mosley v. Tex. Health & Human Servs. Comm'n*, 593 S.W.3d 250, 264 (Tex. 2019); *Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 838 (Tex. 2012).  Second, and more importantly, *Kilbourn* provides a vivid example of how the nineteenth-century legal world understood a legislature's constitutional power to "compel the attendance of absent members."  Again, we strive to interpret the Texas Constitution based on the plain meaning of the text as it was understood by those who ratified it.

---

[10] Like Texas's, many other state constitutions give their legislature a quorum-forcing authority patterned after the federal constitution.  Plaintiffs point to no decision from any of these states holding that the power to "compel" the "attendance" of absent members does not include the power of physical compulsion.

*Sears*, 785 S.W.2d at 251. We have already observed that Texas Legislatures around the time of the provision's enactment understood it to authorize arrest. *Kilbourn* confirms that there existed little doubt in the nineteenth-century legal world that constitutional provisions like article III, section 10 authorize the kind of physical compulsion contemplated in House Rule 5, section 8.

*Kilbourn* is instructive for an additional reason. Plaintiffs' primary contention is that the House's constitutional authority to arrest absent members is constrained by Texas statutory law governing arrest procedures and by various federal constitutional provisions limiting the government's power to arrest or imprison. Yet *Kilbourn* rejects just such an equivalence. The Court held that the House of Representatives lacked the power to arrest a *private citizen* for contempt, but in so holding the Court distinguished the implied constitutional power to arrest private citizens claimed by Congress from the explicit constitutional power granted to Congress to "punish[] its own members" in order to, among other things, "compel the[ir] attendance." *Id.* at 189–90. "The power to punish a citizen for contempt is not in express terms or by implication conferred by the Constitution of the United States upon either House of Congress," the Court observed. *Id.* at **5. The Court stated that allowing Congress such a power would be "in direct contravention of the Fourth and Fifth Amendments." *Id.* Yet after noting that the Fourth and Fifth Amendments constrained any implied power Congress might claim over private citizens, the Court affirmed Congress's *express* constitutional power to punish its members using means such as "imprisonment," including when necessary to force a quorum:

> As we have already said, the Constitution expressly empowers each House to punish its own members for disorderly behavior. We see no reason to doubt that this punishment may in a proper case be imprisonment, and that it may be for refusal to obey some rule on that subject made by the House for the preservation of order. So, also, the penalty which each House is authorized to inflict in order to compel

11

the attendance of absent members may be imprisonment, and this may be for a violation of some order or standing rule on that subject.

*Id.* at 189–90.

All of Plaintiffs' arguments premised on the federal constitution are foreclosed by the U.S. Supreme Court's interpretation of Congress's quorum-forcing authority. Plaintiffs acknowledge that federal case law upholds Congress's authority to physically compel members' attendance. Response at 29. They nevertheless argue that various provisions of the federal constitution prohibit the Texas Legislature from doing the same. But if the federal constitution permits Congress to use physical compulsion against absent members of Congress, we fail to see how it could possibly prohibit the Texas Legislature from doing so under a provision of the Texas Constitution that closely mirrors its federal counterpart.

Plaintiffs' *ex parte* presentation to the district court did not mention *Kilbourn*. In this Court, Plaintiffs contend only that we should ignore altogether any federal case about Congress's textually indistinguishable quorum-forcing power. They contend that because Congress's quorum rule is one-half and the Texas Legislature's is two-thirds, the U.S. Supreme Court's statements about Congress's power to force a quorum are irrelevant. We are not convinced. As a textual matter, Plaintiffs do not explain why the size of the fraction contained in the first half of the provision would change the meaning of the second half of the provision regarding the power to compel attendance. Instead, Plaintiffs contend that federal precedent is irrelevant because article III, section 10 serves a different purpose than its federal counterpart. As Plaintiffs see it, article III, section 10 is a "supermajority" requirement designed to empower a minority faction greater than one-third of the body to shut down business to avoid passage of legislation it opposes. They contend, without citation, that "the architects of the Texas government fully expected, and even

12

encouraged, the power of a cohesive minority of members to 'bust the quorum' as a means of participation in the decision-making process."

Plaintiffs cite no authority for their view of article III, section 10's role in the law-making process. We are aware of none. If the provision contained only a bare quorum requirement, it might indeed operate as the kind of supermajority provision Plaintiffs would like it to be. But it is quite obviously much more than a bare quorum rule. While it does enable quorum breaking by a minority faction, it also enables the remaining members to "compel the attendance of absent members." The two-thirds quorum rule protects against legislative action taken by a smaller fraction of the body. But in the very same sentence, article III, section 10 also protects against efforts by quorum-breakers to shut down legislative business. Rather than impose an absolute supermajoritarian check on the legislature's ability to pass legislation opposed by a minority faction, the provision ensures that the legislature can continue to do business despite efforts by a minority faction to shut it down by breaking quorum.

## C.

None of Plaintiffs' other arguments successfully undermine the well-settled understanding of article III, section 10. Plaintiffs argue that the House cannot arrest them because the mechanism for doing so would not afford them all the statutory and constitutional protections governing civil or criminal arrests. In other words, Plaintiffs ask us to radically reinterpret article III, section 10 because the arrest power it has historically been understood to provide is not perfectly analogous to any of the more commonly exercised arrest powers with which modern courts and law enforcement are more familiar. Our task, however, is to determine the meaning of article III, section 10 within its historical context. Our task is not to determine whether the House's

13

constitutional authority to physically compel the attendance of absent members fits neatly within all the lines drawn by modern laws governing the arrest of private citizens.[11]

Plaintiffs argue that they are protected from arrest by article III, section 14 of the Texas Constitution, which provides that legislators are "privileged from arrest during the session of the Legislature, and in going to and returning from the same." TEX. CONST. art. III, § 14. The federal constitution contains a similar clause, art. I, § 6, cl. 1, which obviously has not been interpreted to prevent Congress from using physical compulsion to secure a quorum. *See Kilbourn*, 103 U.S. at 189–90. Relators correctly point out that constitutional provisions of this nature have long been viewed as privileging legislators against arrest "during their attendance at the sessions . . . and their going to and returning from them," not during purposeful quorum breaks. 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 859 (5th ed. 1891). Plaintiffs' view of the interplay between sections 10 and 14 of article III is unsupported by any authority. Like many of Plaintiffs' other arguments, it would dramatically restructure the constitution's balance between the quorum-breaking ability of the minority and the quorum-forcing power of the remaining members.

Article III of our constitution has become a lengthy document over the years. Its opening sections, however, date to the advent of Texas statehood or before. They establish the foundational

---

[11] Plaintiffs argue that officers of the Department of Public Safety cannot execute the arrest warrants issued by the House. In support, they cite only the general statement of DPS's purpose, which is to "protect[] the public safety and provide for the prevention and detection of crime." TEX. GOV'T CODE § 411.002. They argue, unconvincingly, that this general statement of purpose precludes DPS's involvement in any non-criminal matter. Regardless, DPS has statutory authority to "execute subpoenas and other process . . . that are issued by the speaker of the house of representatives . . . ." TEX. LOCAL GOV'T CODE § 85.022. While this Local Government Code provision empowers only sheriffs to execute process for the speaker of the house, the Government Code confers on the Texas Rangers, a division of DPS, "the powers and duties of sheriffs." TEX. GOV'T CODE § 411.022.

pillars of the legislature's constitutional authority, of which section 10 is a structural component. Section 10 represents a conscious decision by those who framed our constitution to counter-balance the minority's quorum-breaking ability with a quorum-forcing authority vested in the present members. They patterned this quorum-forcing authority on the federal constitution, which has long been interpreted to authorize arrest and imprisonment to force a quorum. We are provided with no reason to doubt that the framers of our constitution understood article III, section 10 to operate just as it has been understood to operate in the many decades since its ratification—to authorize each chamber to compel the attendance of absent members, by physical compulsion if necessary. We decline Plaintiffs' invitation to undermine this foundational authority, which has long been embedded in the very structure of our government.

## II.

According to the temporary restraining order, it appeared to the district court that the prevailing historical understanding of article III, section 10 has been "erroneous[]" all along. *See* TRO at ¶ 1. The district court reached this conclusion based on an *ex parte* presentation from Plaintiffs, not based on the adversarial process on which our legal system depends for the resolution of such questions. Curiously, Plaintiffs' *ex parte* presentation to the district court did not include any mention of *Kilbourn v Thompson*. Defendants, had they been given the chance, would have cited *Kilbourn* and made various other arguments that cast conclusive doubt on Plaintiffs' position, as they have done in this Court. But the district court never gave them the opportunity, instead issuing an order that overturns decades, even centuries, of historical precedent based on a novel interpretation of article III, section 10 proffered *ex parte* by Plaintiffs. It is perhaps understandable that, based solely on the self-serving presentation of one party, the district

15

court came to see some potential merit in that party's position. It is not understandable, however, that the district court chose to base its view of the law on an *ex parte* presentation when there was no valid basis on which to refuse to hear the contrary view from the defendants.

"[E]*x parte* hearings are disfavored in this State as a rule." *Feldman v. Marks*, 960 S.W.2d 613, 615 (Tex. 1996). The reason for this rule is obvious, and this case provides a stark example of the rule's wisdom. It should be obvious from what we have already said that Plaintiffs' *ex parte* presentation of the constitutional issues raised by this case was an inadequate basis for the district court's stated view of the law. "This court only allows [*ex parte*] communications in limited, extraordinary emergency situations." *Barnes v. Whittington*, 751 S.W.2d 493, 495 n.1 (Tex. 1988). Consistent with these principles, Texas Rule of Civil Procedure 680 permits issuance of a TRO "without notice to the adverse party" only when "it clearly appears from specific facts shown by affidavit or by verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and a hearing had thereon." No such showing was made here. The threat of arrest of which the plaintiffs complain has existed since July 13. The plaintiffs nevertheless waited twenty-seven days to file this suit, so any "emergency" that may have existed on August 8 was of their own making. Even assuming some immediate need for relief existed on August 8, Plaintiffs offer no compelling reason why they could not have presented their petition to the district court days or weeks earlier, which would have afforded the defendants ample time to respond. We are provided with no information regarding the circumstances that existed on August 8 and beforehand that could have justified the district court's resort to the disfavored remedy of *ex parte* relief.

16

The TRO suffers an additional deficiency as well. Even assuming that immediate and irreparable injury was imminent on August 8, it remained the responsibility of the TRO applicant and the court to notify and hear from the opposing party if at all possible. Because an adversarial process is always preferable when it is possible, even in emergencies, the rules of procedure require the district court to explain, in the TRO, "why the order was granted without notice" to the opposing party. TEX. R. CIV. P. 680. The only reason the order gives for why the defendants could not be notified is entirely unconvincing. The order states that, as government employees, the State's lawyers could not have been expected to respond to a TRO application over the weekend. TRO at ¶ 2. As the district court should have been aware, this is simply not true. Like many other lawyers, the State's lawyers frequently work nights and weekends to meet short deadlines and respond to emergency filings. Had Plaintiffs or the district court attempted to notify the State and solicit a response on short notice, there is no reason to doubt the State's lawyers would have offered one. Yet neither Plaintiffs nor the district court even bothered to try. Instead, they assumed the State's lawyers would rather not be bothered on a Sunday, and they forged ahead with an *ex parte* order on a sensitive matter of statewide importance. This was a very clear abuse of discretion by the district court.

### III.

Mandamus relief is authorized if the relator establishes a clear abuse of discretion for which there is no adequate appellate remedy. *In re AutoNation, Inc.*, 228 S.W.3d 663, 667 (Tex. 2007) (orig. proceeding). For the foregoing reasons, we conclude that issuing the *ex parte* temporary restraining order despite Plaintiffs' clear lack of a probable right to relief was a clear abuse of discretion by the district court. As for the second element of mandamus relief, the normal appellate

17

process would not have been adequate to address the harm caused by an erroneous order. The current special session expires on September 6. The district court set a hearing on Plaintiffs' application for a temporary injunction on August 20, with no indication that it intended to rule on the application before the special session expired. Absent mandamus relief, a district court, through an *ex parte* TRO, would have essentially eliminated for the duration of the second special session the House's explicit constitutional authority to "compel the attendance of absent members" in the manner of its choosing. Whatever one's view of the politics of the situation, it should be clear that an *ex parte* proceeding where one side is totally shut out of the process was an improper way to resolve matters of such significance.

The district court very clearly abused its discretion by issuing the TRO. The defendants have no adequate appellate remedy. The petition for writ of mandamus is conditionally granted, and the district court is directed to immediately rescind the TRO. We are confident the district court will comply, and the writ will issue only if it does not.

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** August 17, 2021

18